UNITED STATES of America, Appellee,

v.

Martin SCHWIMMER,
Defendant–Appellant.

No. 1411, Docket 89–1106.

United States Court of Appeals,
Second Circuit.

Argued Aug. 18, 1989.

Decided Dec. 27, 1989.

Nathan Z. Dershowitz, New York City (Victoria B. Eiger, Dershowitz & Eiger, New York City, Robert S. Fink, Kostelanetz Ritholz Tigue & Fink, New York City, and Alan M. Dershowitz, Cambridge, Mass., of counsel), for defendant-appellant.

Louis M. Fischer, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D. New York, Bruce Maffeo, Alan Friedman, U.S. Dept. of Justice, Organized Crime Strike Force, Brooklyn, N.Y., of counsel), for appellee.

Before MINER and ALTIMARI, Circuit Judges, and GRAY, District Judge.[*]

MINER, Circuit Judge:

Defendant-appellant Martin Schwimmer appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Eastern District of New York (McLaughlin, J.). The offenses of conviction—one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(d) (1982); seventy-six counts of receiving illegal payments to influence the operations of employee benefit plans, 18 U.S.C. § 1954; one count of conspiracy to defraud the United States, 18 U.S.C. § 371; and six counts of income tax evasion, 26 U.S.C. § 7201—all relate to the receipt of commissions for investing the funds of employee benefit plans in Certificates of Deposit issued by various banks.[1]

Schwimmer argues that the trial court erred in instructing the jury that, whether or not he was a formally constituted agent or counsel of the employee plans allegedly victimized, he was subject to the provisions of 18 U.S.C. § 1954 if his investment advice had a significant influence on the investment decisions of the plans. The government contends that the jury properly could find Schwimmer to be an agent or counsel if it determined he had significant influence on investment decisions, and that he clearly was an agent of the plans he advised for an hourly fee.

Schwimmer argues also that the district court erred in instructing the jury that he was required to disclose his commissions in order to come within the "bona fide compensation" exception provision of 18 U.S.C. § 1954. 700 F.Supp. 104. The government responds that the exception, which allows compensation for services actually rendered to an employee benefit plan, requires disclosure of financial activities involved in administering the plan, to the end that beneficiaries might make proper judgments as to whether the compensation is bona fide.

Finally, it is Schwimmer's contention that he was entitled to a hearing to determine whether his attorney-client, sixth amendment and work product privileges were violated by the use of information, documents and grand jury testimony furnished by an accountant hired to assist the attorneys representing Schwimmer and a co-defendant in the conduct of a joint defense. The government's response to this contention is that a hearing was unnecessary because the trial court properly gleaned from the

---

[*] Hon. William P. Gray, United States District Judge for the Central District of California, sitting by designation.

[1]. Appellant was sentenced on February 14, 1989 to a term of imprisonment of ten years, a term of probation of five years, fined $1.62 million, ordered to forfeit the sum of $4.5 million, and pay a special assessment of $4,050. *See United States v. Schwimmer*, 882 F.2d 22 (2d Cir.1989) (requiring testimony before grand jury after conviction).

record sufficient information to determine that there was no invasion of the attorney-client privilege. We think that the record is insufficient to support the perfunctory findings of the district court with respect to the privilege issue, and we remand for a hearing and detailed findings on that issue, retaining jurisdiction of the appeal pending completion of the proceedings hereby ordered in the district court.

## BACKGROUND

In 1979 Mario Renda formed a corporation known as First United Fund, Ltd. ("First United") to engage in the business of placing Certificate of Deposit ("CD") investments in small banking institutions throughout the United States. The banks and savings and loan associations to which the investments were directed paid a broker's commission to First United. Renda was successful in finding investors and soon hired a number of account executives to contact financial institutions needing cash, offering competitive interest rates and willing to pay for the services of First United. Associated with Renda was Joseph DeCarlo, who attended to the financial records of the business and, until the advent of computerization at First United, sent hand-typed bills for commissions. Early in 1981, Renda and DeCarlo met Schwimmer at a computer store, fell into a conversation with him, and learned that he too was in the business of placing funds for institutional investors. Renda and Schwimmer joined forces shortly thereafter.

Schwimmer had been the investment adviser to four employee benefit plans covering members of Local 38, Sheetmetal Workers International Association ("Local 38"), since 1971. He was paid an hourly fee for his services and agreed that any commissions earned on investment transactions would be reported to Local 38 and used to offset his fees. The guidelines for investing furnished by the trustees of the plans required low risk investments, primarily federally insured CDs. Schwimmer had complete authority to place the assets of the plans, and his annual reports to the trustees were general in nature, without any breakdown of the investments by amount or location. In 1981 Schwimmer became the sole investment adviser to two employee benefit plans covering members of Local 810, International Brotherhood of Teamsters ("Local 810"). Dennis Silverman, administrator of the plans and president of Local 810, advised the union's comptroller that Schwimmer would give him instructions for wiring money to various banks for deposit in CDs. Schwimmer was not paid a fee for his services by Local 810 or the plans, and did not advise them that he was compensated through commissions paid by the banks.

Initially, Schwimmer made only short-term investments through First United under an agreement with Renda calling for an equal division of the commissions. Those investments were made on behalf of the Local 38 plans and some individuals for whom Schwimmer acted. The commissions, negotiated by Renda, were payable at the inception of the deposit. DeCarlo sent the bills for the commissions to the bank, and Schwimmer submitted invoices for his share of the commissions to First United. Soon after he became adviser to the Local 810 plans, Schwimmer advised Renda that he was in a position to place large sums of union funds in long-term investments. He advised Renda that it would be necessary to make payments to "his people" in connection with this business, and the two agreed that they would deduct 7/8 of a point from the commission for that purpose and continue to divide the balance of the commission equally. Schwimmer's "people" presumably were union officials.

Toward the end of 1981, Schwimmer and Renda developed a system of off-the-book accounts for their long-term investment commissions. This system entailed the opening of separate bank accounts to receive deposits of these commission payments and thereby by-pass the regular First United accounts. The separate accounts were non-interest bearing, closed every six months, and not reflected on the books of First United. The institutions paying commissions were directed to wire payment to the appropriate off-book ac-

counts, which were established at six banks during the period 1981–1984. The accounts were not reported to the Internal Revenue Service or First United's outside accountants. The long-term investments for the benefit plans of Locals 38 and 810 were recorded for a time in a notebook kept by DeCarlo. The bills for commissions on these investments, ordinarily computer-generated, were typed separately and forwarded to the appropriate institution at DeCarlo's direction. In order to forestall claims on the commissions by First United account executives, Renda and DeCarlo told the executives that one point of the commission was being paid to the unions. Similarly, Renda told some banking institutions that the union would receive a "discount" on the commissions.

When First United's accountants performed an audit of the company in 1983, Renda told them that $2,700,000 in commissions was due the company on union benefit plan transactions concluded in 1981 and 1982. Renda caused those commissions to be paid into First United's regular, on-the-record account. No prior or subsequent commission payments on the union funds were so reported. Schwimmer received his share of commissions from the regular accounts in the form of "consulting fees." Between December 1981 and December 1984, Schwimmer and Renda placed $72,-910,000 for the Local 810 benefit plans and $22,985,487 for the Local 38 benefit plans in long-term CDs issued by approximately twenty banks and savings and loan associations. Commissions on these deposits totalled $16,520,375, which Schwimmer and Renda shared, subject only to the ⅞ point deductions needed to pay Schwimmer's "people." For more than two years, beginning in January of 1982, Schwimmer cashed First United checks on a regular basis at the Better Farm Supermarket in Elmont, New York. In all, 210 checks totalling over $1,900,000 were cashed during that period. From December 1981 through March 1984, Schwimmer cashed First United checks totalling $1,212,725 at Nu Service Tobacco. All the cashed checks represented shares of commissions on long-term union benefit plan investments. Schwim-

mer cashed other checks signed by Renda in order to make the ⅞ point payments.

Although Schwimmer met annually with the trustees of the Local 38 benefit plans, it was not until 1986 that he reported for the first time that some of the CD investments he had made were not insured. His previous annual report had omitted any reference to the problems of Old Court Savings and Loan Association, a failed institution holding more than one-quarter of the investment funds of the Local 38 benefit plans. In late 1986 the trustees of the plans learned from their counsel that Old Court had failed and that the funds were in jeopardy. Schwimmer then reported that the investments in Old Court were not insured by the federal government, contrary to the trustees' instructions. Pressed by the trustees for information regarding his relationship with brokerage houses, Schwimmer ultimately signed a letter representing that he had not received any commissions or compensation from any broker for placing CDs for any Local 38 benefit plan. At a trustees' meeting in December of 1986, he specifically represented that he did not conduct any Local 38 business through First United Fund. Not only were the representations untrue, but Schwimmer also had failed to offset the hourly fees for investment advice paid by Local 38 with the commission compensation he received from First United, as required by his agreement with the union.

Local 810 and its benefit plans had no agreement with Schwimmer regarding payment for investment services. The union's comptroller, Gilman, assumed that Schwimmer was receiving commissions from some source but did not think that it was his function to inquire. Even after it was reported to the union that commissions had been paid, the union was unaware of the amounts involved. Gilman considered Schwimmer to be a broker who produced investment opportunities to be accepted or rejected by the plans and sometimes called local banks to compare their interest rates with those offered by Schwimmer. On at least one occasion, a bank offered a CD interest rate higher than that ultimately

received by the Local 810 plans because the commissions that were arranged reduced the return to the plans.

When the government began its investigation into their employee benefit plan investment activities, Schwimmer and Renda each retained counsel. Schwimmer retained the law firm of Kostelanetz Ritholz Tigue & Fink, and was represented principally by Robert S. Fink of that firm. Renda retained the law firm of Russo, Silverman and Vitaliano and was represented principally by Ronald Russo and Larry Silverman of that firm, which also represented the interests of First United. Schwimmer, Renda and their attorneys agreed to cooperate in all matters of mutual concern related to the investigation and to the defense of any charges that might be made against them. The attorneys decided that it was necessary to hire an accountant to analyze the financial transactions in which their clients had engaged as well as the tax consequences of those transactions. Ralph Glickman, a certified public accountant, was hired by attorney Silverman in June of 1984 to serve the joint interests.

Although Silverman, attorney for Renda and First United, worked most closely with Glickman, Schwimmer's attorney, Fink, also met with the accountant from time to time. Fink told his client to speak freely with Glickman and that any conversations with the accountant would be protected by the attorney-client privilege. Schwimmer spoke to Glickman at some length on the occasion of their first meeting, which took place at the offices of First United in June of 1984. Present for all or part of that meeting, besides Glickman and Schwimmer, were Renda, Silverman, Ronald Russo of Silverman's law firm, Stewart Steinberg, another attorney for Renda, Kenneth Gould, a partner of Glickman, and Joseph DeCarlo. Schwimmer spoke to Glickman on several occasions thereafter. He also furnished information to the accountant through Fink and Silverman.

On July 2, 1987, and again on July 27, 1987, pursuant to a subpoena, Glickman appeared before the grand jury that ultimately returned an indictment charging Schwimmer and Renda in eighty-nine counts with racketeering conspiracy, illegal pension and welfare fund payments, kickbacks to union officers, embezzlement, obstruction of justice and tax evasion. Glickman testified that he examined certain records after he was hired by Silverman but, in response to a request to describe the records, responded as follows: "I don't believe I am permitted to specify exactly what records I looked at or what I did for Mr. Silverman." He then testified that he provided commission income figures to David Cohen, Renda's accountant, for the preparation of Renda's 1983 and 1984 personal income tax returns. Glickman said that the figures were acquired "[f]rom the analysis that we made for Mr. Silverman" and were provided verbally to Mr. Cohen for inclusion in the tax returns. Glickman derived the figures from certain work papers, which he never showed to Cohen and refused to discuss before the grand jury.

Glickman also testified before the grand jury that he provided Cohen with certain information for preparation of the 1984 tax returns of a corporation known as "First United Air, Inc." This corporation owned and leased out an aircraft and received certain CD commission income, and its stock was held in equal shares by Schwimmer and Renda. When asked to identify the work papers used to prepare the First United Air returns as well as the personal returns, Glickman responded: "The work papers were prepared. As to the details in the work papers, that I cannot discuss." When asked specifically whether CD purchases by Locals 38 and 810 were noted in those materials, he declined to answer. In response to a question pertaining to his review of the records of an account opened in the name of First United Fund, Ltd. and later changed to the name of First United Air in the Connecticut Bank and Trust Co., the accountant replied: "I believe that I am not permitted to discuss that because this was an analysis that was prepared for the attorneys and under client-attorney privilege I am not permitted to discuss that." The Assistant United States Attorney conducting the grand jury proceeding respond-

ed: "We certainly respect that privilege, sir."

On August 18, 1988, almost three months after Mario Renda entered a plea of guilty to Counts One (racketeering) and Eighty-three (tax evasion) of the Indictment and agreed to testify at the trial of his co-defendant, Glickman met with the Assistant United States Attorney in charge of the prosecution. According to the prosecutor, Glickman at that time advised that he had arrived at the figures shown on the 1983 and 1984 Renda personal returns and the 1984 First United Air returns by examination of bank statements pertaining to the off-book accounts as well as the records furnished by Joseph DeCarlo, all of which had been available to the government previously. The prosecutor then directed Glickman to turn over to the case agents the "schedules" the accountant had prepared. He contends that he never has seen the schedules but "was told by the agents that they contain nothing more than a scheduling of records previously acquired and examined by the government during the grand jury investigation."

Schwimmer contends that the work papers, or schedules, included privileged information not previously available to the government. Although the work papers were not offered in evidence,[2] Schwimmer asserts that the government used the information contained therein to prepare questions, decide who should be called as witnesses and for trial preparation generally. In short, Schwimmer takes the position that the work papers were of great assistance to the government in assembling, organizing and proving its case. Schwimmer points to two of these documents to demonstrate that the government acquired information in the form of figures and allocations not available from bank records or records previously in the government's possession. One item, entitled "Analysis of Commissions," contains a breakdown of commissions for both Schwimmer and Renda, and apparently includes the "bottom line" figure furnished verbally by Glickman to Cohen for the 1984 Renda personal returns. Also included in this schedule were the names of the business entities that cashed First United checks at Schwimmer's behest. The other item consists of two summary worksheets, supported by detailed worksheets, allocating commissions between Schwimmer and Renda in 1983 and 1984. Schwimmer contends that the information contained in this item also was not available from the bank records or any other materials previously available to the government in any form. According to Schwimmer, the two items were prepared by the accountant solely for purposes of the joint defense.

The district court deferred until the close of the testimony Schwimmer's motion to dismiss the indictment for violation of the attorney-client privilege or for a hearing to determine whether there had been such a violation and, if so, the extent thereof. Prior to instructing the jury, the court ruled upon the motion as follows:

Having heard the testimony and evidence presented during the trial, and having now inspected the grand jury testimony and the documents which Glickman gave to the government, I now determine that the government has not violated the defendant's attorney-client privilege.

As to the grand jury testimony, it dealt almost exclusively with Glickman's participation in the preparation of Renda's personal tax returns for 1983 and four and the corporate tax return of First United for '84.

References to Mr. Schwimmer were negligible and amounted to virtually nothing except to say that Glickman had in fact met Schwimmer.

As to the documents, similarly, these documents submitted by Glickman to the government were merely schedules used to prepare First United's tax return or schedules setting forth the activities of

---

**2.** The work papers in question were submitted to the trial court for *in camera* inspection on the issue of attorney-client privilege. They were not made a part of the original record but have since been turned over to counsel for defendant, who has furnished them to us, without objection, in the form of a supplemental appendix.

the several First United Fund bank accounts. Thus, I find there has been no invasion of Schwimmer's defense camp by Glickman.

## DISCUSSION

Narrowly defined, riddled with exceptions, and subject to continuing criticism, the rule affording confidentiality to communications between attorney and client endures as the oldest rule of privilege known to the common law. *See generally* 2 Weinstein and Berger, *Weinstein's Evidence* ¶ 503[02]–503(d)(5)[01]; Fisch on New York Evidence § 517 (2d ed. 1977). Even in its debilitated form, however, it provides essential support for the constitutional right to the assistance of counsel. Without the attorney-client privilege, that right and many other rights belonging to those accused of crime would in large part be rendered meaningless. Designed "to encourage full and frank communication between attorneys and their clients," this rule of confidentiality "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). It also recognizes that a lawyer's "assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888); *see also Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980); *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

■ The attorney-client privilege generally forbids an attorney from disclosing confidential communications that pass in the course of professional employment from client to lawyer. *See generally* 81 Am.Jur. 2d *Witnesses* § 172 (1976). The relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which the protection is claimed, all must be established in order for the privilege to attach. *Re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032 (2d Cir.1984). The privilege also is held to cover communications made to certain agents of an attorney, including accountants hired to assist in the rendition of legal services. *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961). As to such agents, "[w]hat is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer." Id.* at 922 (emphasis in original). Information provided to an accountant by a client at the behest of his attorney for the purposes of interpretation and analysis is privileged to the extent that it is imparted in connection with the legal representation. *Id. See generally* Annotation, *Applicability of Attorney–Client Privilege to Communications Made in Presence of or Solely to or by Third Person,* 14 A.L.R.4th 594, 635 (1982).

■ The joint defense privilege, more properly identified as the "common interest rule," *see generally* Capra, *The Attorney–Client Privilege In Common Representations,* 20 Trial Lawyers Quarterly, Summer 1989, at 20, has been described as "an extension of the attorney client privilege," *Waller v. Financial Corp. of Am.,* 828 F.2d 579, 583 n. 7 (9th Cir.1987). It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. *See United States v. Bay State Ambulance and Hosp. Rental Serv.,* 874 F.2d 20, 28 (1st Cir.1989). Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected. *Eisenberg v. Gagnon,* 766 F.2d 770, 787 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Matter of Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120 (3d Cir.1986). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal mat-

ter," Capra, 20 Trial Lawyers Quarterly, at 21 (citation omitted), and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply, *United States v. Zolin,* 809 F.2d 1411, 1417 (9th Cir.1987), *vacated in part on other grounds,* 842 F.2d 1135 (9th Cir.1988) (en banc), *aff'd in part and vacated in part on other grounds,* — U.S. —, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Neither is it necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney. *Matter of Grand Jury Subpoena,* 406 F.Supp. 381 (S.D.N.Y.1975); *cf. Hunydee v. United States,* 355 F.2d 183 (9th Cir.1965).

As in all claims of privilege arising out of the attorney-client relationship, a claim resting on the common interest rule requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given. *See United States v. Keplinger,* 776 F.2d 678, 701 (7th Cir.1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984). The protection afforded by the privilege extends to communications made in confidence to an accountant assisting lawyers who are conducting a joint defense on behalf of the communicating clients. *See United States v. Judson,* 322 F.2d 460 (9th Cir.1963). It applies "regardless of the manner in which it is sought to put the communications in evidence, whether by direct examination, cross-examination, or *indirectly as by bringing out facts brought to knowledge solely by reason of a confidential communication.*" 81 Am Jur. 2d *Witnesses* § 194 (emphasis added). The burden of establishing the attorney-client privilege, in all its elements, always rests upon the person asserting it. *In re Horowitz,* 482 F.2d 72 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *von Bulow v. von Bulow,* 811 F.2d 136, 146 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

Schwimmer has carried the burden of establishing that the information he furnished to Glickman, the accountant hired by Renda's attorney to serve the joint interests of Renda and himself, was protected by the attorney-client privilege. Schwimmer was directed by his attorney, Fink, to speak freely with Glickman, who had been hired by Silverman, Renda's attorney, on behalf of both clients. The attorneys had agreed to cooperate in all matters of mutual concern relating to the investigation by the government then in progress, and Fink represented to Schwimmer that any conversations with Glickman would be privileged. The common interest rule clearly is applicable here, since the information given by Schwimmer to Glickman was imparted in confidence for the ultimate purpose of assisting attorneys who had agreed upon and undertaken a joint strategy of representation, all of which was well understood by Schwimmer. Indeed, the government is willing to assume, for purpose of this appeal, "that appellant has a valid claim to the joint or common defense privilege." The government contends, nevertheless, that it obtained no information by invading that privilege. It is not so clear that this is so.

In his testimony before the grand jury, Glickman repeatedly invoked the attorney-client privilege when questioned concerning the records he examined, the work papers he prepared, and the analyses he formulated for the attorneys providing the joint representation. The Assistant United States Attorney conducting the grand jury proceedings at one point acknowledged that the privilege properly had been claimed. Yet, the same Assistant United States Attorney spoke with Glickman at some length at a meeting following Renda's guilty plea, presumably about matters relating to the investigation, and at that time directed the accountant to turn over to the case agents the schedules he had prepared. Neither the testimony of the accountant nor the schedules he delivered were offered in evidence at Schwimmer's trial. Schwimmer contends, however, that information *derived* from these sources was used by the government, in

violation of the attorney-client privilege, to prepare for trial. The *indirect* use of confidential information is what is challenged here. The government asserts that the accountant furnished *no* information not otherwise available to it. There is reason to question that assertion.

Although the government argues that the work papers furnished by the accountant consist only of schedules attached to the First United Air tax returns and schedules of checks written on several off-book First United Bank accounts, all unprivileged information available to the government, our review of the work papers reproduced in the supplemental appendix suggests other possibilities. Certain of these documents are not of the type ordinarily submitted with corporate tax returns, and others appear to contain information not ascertainable from bank records. For example, a work paper entitled "Analysis of Commissions," containing listings for Renda, Schwimmer and "Genl" appears to contain the "bottom line" figure furnished by Glickman to Cohen for Renda's 1984 personal tax return and related to the grand jury by the accountant. Glickman nonetheless refused to describe to the grand jury how that figure was arrived at, but the allocation is shown on the worksheet. Listed in the same worksheet, under Schwimmer's name, is "Nu Tobacco," one of the entities regularly used by Schwimmer to cash First United checks, with a corresponding dollar amount. Other worksheets contain allocations of commissions between Schwimmer and Renda, items not ordinarily part of corporate tax returns or available from bank records.

The district court found that, since the references to Schwimmer in Glickman's grand jury testimony were "negligible," and since the documents delivered to the government by the accountant were merely tax returns and schedules relating to bank accounts, there was "no invasion of Schwimmer's defense camp by Glickman." We think that, based on the documentation available to it, the district court should have conducted an evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege in regard to confidential communications passing from Schwimmer to Glickman. We remand to the district court for such a hearing and, in the event of an affirmative finding, a determination as to what use was made of the derivative information and whether a substantial right of the appellant was affected. The panel will retain jurisdiction of the appeal pending completion of the hearing hereby directed and the return of the district court's findings of fact and conclusions of law on the issue remanded.

## CONCLUSION

The matter is remanded to the district court for further proceedings consonant with the foregoing.