**SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff,**

v.

**STRATTON OAKMONT, INC., Defendant.**

**Bankruptcy No. 97–8074A(TLB).**

United States Bankruptcy Court,
S.D. New York.

Sept. 24, 1997.

Well, Gotshal & Manges, L.L.P. by Curt P. Beck, Steven A. Reiss, New York, NY, for Harvey R. Miller, Trustee for Liquidation of Stratton Oakmont.

Phillips, Lytle, Hitchcock, Blaine & Huber, by Leon C. Marcus, William M. Rossi–Hawkins, New York, NY, Stillman & Friedman, P.C. by Charles A. Stillman, Andrew D. Kaizer, Michael J. Grudberg, New York, NY, for Daniel M. Porush.

## DECISION GRANTING MOTION TO COMPEL DISCOVERY AND DENYING MOTION FOR PROTECTIVE ORDER

TINA L. BROZMAN, Chief Judge.

Harvey R. Miller, Esq., as trustee (the "Trustee") for the liquidation of Stratton Oakmont, Inc. ("Stratton") under the Securities Investor Protection Act of 1970, asks me to resolve a discovery dispute with Daniel Porush ("Porush"), a former principal of Stratton. On the basis of a joint defense privilege, Porush is objecting to the discovery sought by the Trustee pursuant to Federal Rule of Bankruptcy Procedure 2004.

### I

Stratton was a retail securities brokerage company with which Porush had been affiliated since 1989. On March 20, 1992, the Securities and Exchange Commission ("SEC") sued Stratton and three of its principals, Porush, Jordan Belfort and Kenneth Greene, in the District Court for the Southern District of New York (*SEC v. Stratton Oakmont, et al.*, 92 Civ. 1993(JES)). That litigation concluded by the entry of a consent order, dated March 17, 1994, between the SEC and Belfort barring the latter from association with any broker, dealer, investment company, investment adviser or municipal securities dealer. Pursuant to the SEC order, Belfort sold his 47.5% ownership interest in Stratton to Porush for $1,200,000 (the "Buyout Agreement") and agreed not to compete with Stratton for 15 years in return for the payment of $180,000,000 over a defined period of time (the "Non–Compete Agreement") (together the "Agreements"). One wonders about the size of the Non–Compete payment because, in large part of course, Belfort could not directly compete with Stratton without running afoul of the SEC consent order. There may have been some limited areas, however, in which Belfort could have impinged on Stratton's business.

This discovers dispute revolves around the drafting of and discussions relating to the Buyout and Non–Compete Agreements. Three law firms were involved (probably on behalf of Stratton alone) in the drafting and evaluation of the Agreements: Bernstein & Wasserman ("B&W") (up until January 1994), Squadron, Ellenoff, Plesent & Sheinfeld ("Squadron") and Parker Chapin Flattau & Klimpl ("Parker Chapin"). As a result of the SEC action, Porush retained Stillman & Friedman ("S&F") in November, 1993, to represent him individually.

The Trustee is conducting an investigation into the causes of action he may possess relating to the Agreements and, to that end, has deposed Hartley Bernstein, Esq., the partner at B&W in charge of drafting them. B&W produced responsive documents pursuant to a subpoena *duces tecum* issued by the Trustee on July 7, 1997. As a result of information uncovered at Bernstein's deposition, the Trustee subpoenaed both Squadron and Parker Chapin to produce documents and testimony. Ira Sorkin, the partner at Squadron responsible for drafting the Agreements, provided a privilege log at his deposition, stating that he was withholding certain documents at the request of S&F, which was asserting Porush's "attorney-client privilege" with respect to the information sought to be discovered in those documents.

Although the Trustee makes mention of his intention to seek discovery from Parker Chapin and further discovery from Squadron, the relief he seeks in the present motion is more limited. Having waived Stratton's attorney-client privilege, which he is entitled

to do under *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 349, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985), the Trustee seeks to compel Stratton's former lawyers at Squadron to produce the documents listed in the privilege log and to disallow the firm from further asserting any claims to attorney-client privilege with respect to those documents or any conversations relating thereto. Porush objects, asserting that he, Belfort, Greene and Stratton "pursued a joint-defense strategy through which they exchanged and maintained privileged client confidences, as well as work product of the parties' attorneys, under an oral joint defense agreement that all materials so shared would be preserved as confidential against non-members of the group." In response to the Trustee's motion, Porush moved for a protective order pursuant to Fed. R. Bankr.P. 7026.

Porush asserts that there are two periods when oral joint defense agreements were in effect. The first of these began when the SEC filed its complaint and concluded, according to Porush, in the Spring of 1994 when the Agreements were executed. The second period is said to have begun in December 1995 and to have ended in April 1996 when the Agreements were under investigation by governmental authorities.

Although Porush seemed initially to be contending that Squadron was not only Stratton's but his counsel as well, he has retreated from that position asserting only a joint defense privilege relying on the alleged oral joint defense agreements. The Trustee disputes the existence of any joint defense agreements but argues, in the alternative, that any joint defense privilege arising therefrom has been waived.

## II.

### A.

I deal first with the issue of waiver because, if the Trustee be correct, I need not enter the evidentiary thicket of whether a joint defense privilege[1] ever arose. The Trustee asserts that his adversity to Porush coupled with his succession to the rights of the debtor serves to waive any privilege which arose. Porush responds that although multiple clients represented by the same counsel waive the joint client privilege by one's institution of suit against another, the same rule ought not apply if the clients are separately represented. So it is to that which I turn.

The joint defense privilege is an extension of the attorney-client privilege. *U.S. v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989); *In the Matter of Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381, 388 (S.D.N.Y.1975). It is not an independent basis for privilege but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party. As such, the joint defense privilege assumes the existence of a valid underlying privilege. *U.S.v. Weissman*, 1996 WL 737042, at *7 (S.D.N.Y. Dec. 26, 1996); *In re Grand Jury Subpoenas, 89-3 and 89-4*, 902 F.2d 244, 249 (4th Cir.1990).

In *U.S. v. Schwimmer*, both defendants were under SEC investigation and retained separate counsel. One of the defendants disclosed information to an accountant retained by the attorney for the co-defendant. The disclosed information was deemed privileged under the joint defense privilege because the accountant had been hired to serve the joint interests of both defendants in furtherance of

**1.** Federal courts have used the term "joint defense privilege" to refer to both the joint client privilege and the common interest rule privilege (also known as the allied lawyer privilege). 24 CHARLES A. WRIGHT & KENNETH A. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5493 (1997). A distinction should be made between these two doctrines. The joint client doctrine applies when clients share the same lawyer; whereas the common interest or allied lawyer doctrine applies when parties with separate lawyers consult together under the guise of a common interest or

defense. *Id.* Although the doctrines are conceptually different, the interchangeable use of the phrase "joint defense privilege" to refer to both of them has engendered considerable confusion. Since the inception of the SEC proceedings, Porush and Stratton have retained separate counsel. Therefore, for purposes of this decision, I will use the phrase "joint defense privilege" to refer to the situation where independently represented parties have agreed in one manner or another to pursue a joint defense.

defending the SEC action brought against them. *Schwimmer,* 892 F.2d at 244. The circuit court observed that "[t]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter". *Id.* The Second Circuit defined the joint defense privilege as

> serv[ing] to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. Only those communications made in the course of an ongoing common enterprise and intended to further that enterprise are protected.

*Id.* at 243 (*citing Matter of Bevill, Bresler & Schulman Asset Management,* 805 F.2d 120, 126 (3d Cir.1986)) (holding that the party asserting a joint defense privilege must establish that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived); *accord Weissman,* 1996 WL 737042 at *8 ( *also citing Bevill,* 805 F.2d at 126).[2]

In *U.S. v. Weissman,* 1996 WL 737042, at *7 (S.D.N.Y. Dec. 26, 1996), Empire Blue Cross Blue Shield ("Empire") and its chief financial officer, Jerry Weissman, were under government investigation with the latter being subsequently indicted. Empire and Weissman retained separate counsel in order to prepare a defense and respond to the

investigation. Weissman contended that he was indicted as a result of Empire's counsel's improperly disclosing information to the government in violation of Weissman' joint defense privilege. However, Weissman was unable to provide any uncontroverted testimonial evidence that would establish the existence of a joint defense arrangement between himself and Empire. Nor could he positively corroborate his contentions without asking the court to mediate a swearing contest. As a result, the Court held that Weissman had not established a joint defense privilege under the standard set forth in *Schwimmer.* Had a valid joint defense privilege been proven, however, the Court stated that it could not have been waived without the consent of all the parties to the joint defense agreement.[3] *Id.* at *26; *In re Grand Jury Subpoenas, 89-3 and 89-4,* 902 F.2d at 248; *Matter of Grand Jury Subpoena, Etc., Nov. 16, 1974,* 406 F.Supp. at 394.

Here, Porush has the burden of establishing the existence of a joint defense under *Schwimmer* as well as non-waiver of the privilege. *Weissman,* 1996 WL 737042, at *8, *25. Unless the parties to the joint defense agreement consent to terminating the privilege, it can only be waived by subsequent litigation between the parties. *The Evidence Project,* 171 F.R.D. 330, 525 (1997). Most of the case law discussing waiver of the joint defense privilege by subsequent litigation *inter sese* addresses the joint client situation as opposed to the allied lawyer or common interest situation.[4] Unfortunately, even though both *Schwimmer* and *Weissman* are

---

2. The Trustee's reliance on *Bevill* is inappropriate beyond the statement of the required elements of the joint defense privilege. That case addressed when an officer can successfully assert a personal attorney-client privilege with respect to his or her communications with corporate counsel. *Bevill,* 805 F.2d at 124. The present case can be distinguished on the basis that Porush is not asserting a personal attorney-client relationship with Stratton's counsel. *U.S. v. International Brotherhood of Teamsters,* 119 F.3d 210 (2d Cir.1997) is inapposite for the same reason.

3. Thus, B&W's production of documents and Bernstein's deposition do not waive any privilege belonging to Porush. A waiver by one party to a joint defense agreement does not waive any other party's privilege over the same communications.

*Ohio–Sealy Mattress Manufacturing Co. v. Kaplan,* 90 F.R.D. 21, 29 (N.D.Ill.1980).

4. With respect to the joint client privilege, it is well established that it is waived in a subsequent controversy between joint clients. I J.W. STRONG, MCCORMICK ON EVIDENCE, § 91 at 335 (1992); *In re Megan–Racine Associates, Inc.,* 189 B.R. 562, 572 (Bkrtcy.N.D.N.Y.1995)(joint client case) (*citing Matter of Grand Jury Subpoena, etc., Nov. 16, 1974,* 406 F.Supp. at 393); *In re Sunrise Securities Litigation,* 130 F.R.D. 560, 573 (E.D.Pa.1989) (discussing waiver of "joint defense privilege" with respect to communications that were made while the defendants were jointly represented); *Matter of Michigan Boiler and Engineering Co.,* 87 B.R. 465 (Bkrtcy.E.D.Mich.1988) (joint client case); *Ohio–Sealy Mattress,* 90 F.R.D. at 29 (joint client case).

allied lawyer cases, they do not reach the waiver issue. Nonetheless, the few cases and voluminous commentary that do address the issue state that subsequent litigation *inter sese* operates to waive the joint defense privilege in both contexts.[5]

The seminal case, *In the Matter of Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381 (S.D.N.Y.1975), arose out of a Grand Jury investigation of suspected securities manipulations by International Controls Corp. ("ICC") and Investors Overseas Services, Ltd. ("IOS"). Pursuant to a subpoena *duces tecum*, attorneys from Hogan & Hartson, ICC's counsel, produced many responsive documents but claimed an attorney-client privilege as to the remainder. The grand jury exhibits consisted of memoranda and notes recording interviews and discussions during meetings which occurred from October, 1972, through January, 1973. These meetings were prompted by an investigation and subsequent civil action brought by the Securities and Exchange Commission ("SEC") against ICC, IOS and several of its officers and directors (primarily Robert L. Vesco, Stanley Graze and Norman LeBlanc).

During the initial stages of the SEC investigation, Vesco and ICC were jointly represented by Hogan & Hartson. As of mid-October 1972, Paul Weiss Rifkind Wharton and Garrison ("Paul Weiss") was retained as co-counsel for Vesco in the SEC proceedings. Wilkie Farr & Gallagher ("Wilkie Farr") was acting as counsel for IOS. On October 27, 1972, attorneys from Hogan & Hartson, Paul Weiss and Wilkie Farr met in Nassau, agreeing to join forces and coordinate their efforts in defense of the anticipated litigation.

The SEC filed the civil action against ICC, IOS, Vesco and others on November 27, 1972. On or before that date, Hogan & Hartson terminated its formal representation of Vesco, leaving Paul Weiss as his sole counsel. On December 3 and 4, 1972, attorneys from Paul Weiss, Hogan & Hartson and Steptoe & Johnson (acting as co-counsel for IOS) met in Nassau to reiterate the importance of a cooperative effort between the defendants and their respective counsel. They also discussed the assignment of separate counsel with respect to those defendants who were not then individually represented. The various counsel agreed to divide the attorney labor amongst themselves in preparation for the upcoming SEC litigation. Hogan & Hartson was responsible for conducting interviews of co-defendants. Another firm compiled transcripts, while Paul Weiss was assigned the maintenance of a central repository of relevant documents available to all defense counsel. Counsel repeatedly discussed the question of privilege; they purposely excluded from defense strategy meetings and interviews, in order to preserve confidentiality, persons not involved in the defense against the SEC action. Given these facts, the district court held that "[a]ll of the above activities, singly and in combination, bear the markings of a conscious and conscientious joint defense undertaking." *Id.* at 391. In discussing the scope of the joint defense privilege, the court held:

> To be sure, what is divulged by and to the clients present at such a meeting cannot be deemed to be confidential *inter sese;* in any later controversy between or among those clients the privilege could not stand as a bar to full disclosures at the instance of any one of them.

*Id.* at 386.

The government argued that a joint defense privilege, if any, could not attach to documents recording Vesco's statements to Hogan & Hartson during December, 1972, and January, 1973, interviews. The govern-

---

5. 2 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL, Rule 501, at 603–604 (6th ed.1994); Daniel J. Capra, *The Attorney–Client Privilege in Common Representations*, 20, No. 1, TRIAL LAW. QUART., 20, 26 (Summer 1989); Gerald Heller, *Raising The Joint Defense Privilege*, 44–JAN FED. LAW. 46, 48 (1997); Robert W. Higgason, *The Attorney–Client Privilege in Joint Defense and Common Interest Cases*, 34–AUG HOUS LAW 20, 24 (1996); Peter E. Calamari, *Failing Financial Institution Investigations: Privilege Considerations*, 466 PLI/COMM 305, 315 (1988); *see* Patricia Welles, *A Survey of Attorney–Client Privilege in Joint Defense*, 35 U. MIAMI L. REV. 321, 331–332 (January 1981); *The Attorney–Client Privilege in Multiple Party Situations*, 8 COLUM. J.L. & SOC. PROB. 179, 193 (1972); *but see* Susan K. Rushing, Note, *Separating the Joint–Defense Doctrine from the Attorney–Client Privilege*, 68 TEX. L. REV. 1273, 1299–1300 (May 1990).

ment contended that ICC and Vesco stood adversely to each other during that time frame because SEC staff members had indicated to both Hogan & Hartson and Paul Weiss that ICC might have a cause of action against Vesco. The court explained that such a potential for future' adversity did not destroy the present privilege. The court's language, albeit *dictum,* is instructive on the waiver issue:

> Moreover, if an action by ICC against Vesco might have been foreseeable as early as December 1972 and January 1973, that alone would not have prevented Vesco and ICC from sharing confidential information for the purpose of a joint defense against the immediate SEC action. **Those confidences might have placed Vesco at his peril in the event that a private action were eventually instituted by ICC.** Nevertheless, assuming *'arguendo* that such peril was anticipated and appreciated by Vesco and his counsel, Vesco was entitled to risk it for the sake of strengthening his immediate defense by cooperation from and with ICC and the other co-defendants. That a joint defense may be made by somewhat unsteady bedfellows does not in itself negate the existence or viability of the joint defense. (Emphasis added).

*Id.* at 392.

The SEC action was terminated in early 1973 by consent decree. In June, 1973, ICC commenced suit against Vesco and others, tracking the same charges as the SEC had alleged in its cause of action. *Id.* at 393. Although Vesco and ICC were adverse at that moment, the court declined to find a waiver of the joint defense privilege because it was the government seeking to introduce the documents in a grand jury proceeding and not ICC in its own private action. The court reasoned that it would render the privilege meaningless if a third party could take advantage of a waiver between parties to a joint defense agreement. Commenting on the risks and benefits of the joint defense privilege, the court observed:

> The attorney-client privilege ... is no less vital to the functioning of a joint defense than it is to the proper course of wholly independent representation. Nev-

ertheless ... the law exacts a higher cost for participation in a joint defense. To be sure, confidences shared by joint defendants and their counsel are effectively shielded against outside access ... [T]hat shield may be lowered only when the parties once joined assume the stance of opposing parties in subsequent litigation. This restructuring of the parties' rights is a logical incident of their later posture: when they face one another in litigation, neither can reasonably be allowed to deny to the other the use of information which he already has by virtue of the former's own disclosure.

*Id.* at 394. This does not mean, however, that the rest of the world suddenly becomes entitled to privileged information just because the internal structure of the joint defense unit has been changed. Capra, *supra* at 26.

The policy behind the joint-defense privilege is "to promote the general efficiency of legal representation by giving parties the tactical advantage of access to information in the possession of others." Rushing, *supra* at 1280. In joint defense situations, parties purposely retain separate counsel in order "to avoid difficulties resulting from actual or potential conflicts of interest among the parties." *Id.* The joint defense privilege allows the parties to exchange relevant information addressing their common interest or defense without compromising each party's need to safeguard and protect its own interests from too close an association with the other parties.

The main difference between the joint defense and joint client scenarios is that the parties who jointly consult one attorney do not believe they have or do not anticipate having any conflicts of interest amongst themselves and are convinced that joint representation will be more efficient. With respect to the common interest or defense, the parties and their respective attorneys pool information in order to maximize efficiency, and in large multi-defendant cases, minimize costs. The basis of the privilege is unity— unity of interest and unity of defense of that interest. Welles, *supra* at 337. Technically, there may be as many attorneys as there are

parties, but with respect to the issues that brought them all together, the "allied lawyers" are acting as one counsel or, put another way, the attorney for one client becomes the attorney for all on the common issues. *See id.*

■ Given this analogy, if subsequent litigation *inter sese* operates to waive the joint client privilege then it should waive the joint defense privilege for the same reason. In a joint client situation, there is no secrecy between the two parties at the time of communication. 8 MCNAUGHTON, WIGMORE ON EVIDENCE, § 2312 at 608 (1991). In a joint defense situation, the parties and their respective attorneys are joining forces specifically to gather information concerning the common interest or defense and to plan the best way to address it. Presumably, such a joint defense cannot work if the parties are not open with each other. There should be no secrecy between them at the time of communication. Just as a former joint client would expect to be able to use the information previously acquired about the other joint client against him in a subsequent and related litigation, the expectations of a former member to a joint defense agreement should be no different. It would be unrealistic to expect the parties to covet the joint defense communications forever, especially in large multi-defendant cases where related subsequent litigation often arises among co-defendants. Therefore, I conclude that a joint defense privilege is waived where two parties, previously members to a valid joint defense agreement, subsequently find themselves facing each other as adversaries in litigation.

B.

Seizing on the teaching of *Grand Jury Subpoena* to the effect that a suit by a third party (there, the government) cannot destroy the joint defense privilege, Porush argues that the Trustee, not having been part of the original joint defense group, is more akin to a third party than to Stratton itself and that the Trustee is therefore incapable of eviscerating the joint defense privilege by commencing suit against Porush. I disagree.

Whereas I have substantial doubt that the joint defense privilege could attach to the Non–Compete Agreement because that agreement did not serve to resolve the SEC action or to effectuate the SEC consent order pursuant to which Belfort was prohibited from similar work in the industry, I will assume nonetheless for purposes of this motion that there was a valid joint defense agreement.

■ The trustee is the representative of the estate. He inherits whatever claims the debtor possesses as well as certain avoidance powers which are derivative of the rights of creditors. It is for this very reason that the power to waive the corporation's attorney-client privilege resides in the Trustee. *Weintraub,* 471 U.S. at 349, 105 S.Ct. at 1991. As the successor in interest to Stratton, he is just as capable of becoming adversarial to the joint defense group as would be Stratton itself. *See Michigan Boiler,* 87 B.R. at 470–471. If, for example, Porush breached a fiduciary obligation to Stratton and its creditors by saddling Stratton with a $180 million obligation to secure Belfort's agreement not to compete when Belfort was already prohibited by the consent decree from engaging in most of the business which Stratton conducted, then the Trustee could sue Porush.

■ The nuance that remains is technical in that the Trustee has not yet officially filed a lawsuit—although he has obtained court orders pursuant to Fed. R. Bankr.P.2004 allowing him to examine persons with knowledge of the Agreements.[6] Were there no bankruptcy and hence no trustee, Stratton would have no ability to take discovery before suing Porush and Belfort. Stratton would have to commence suit and the joint defense privilege would be broken. The same result could obtain here were I to quash the discovery and tell the Trustee simply to commence suit. But as a policy matter, bankruptcy trustees ask first and sue later because they have no first-hand knowledge sometimes of the existence and often of the strength of claims they may possess.

**6.** The Trustee actually has sued Porush but on claims other than these.

**440**

Like the *Michigan Boiler* court, I believe that where, as here, a trustee is conducting an investigation as to the factual underpinning and scope of identifiable claims, he or she is adverse to the putative defendants. *Id.* The trustee should not be stymied in uncovering the facts by the existence of a joint defense privilege which would evaporate were he or she only to file a complaint.

Having concluded that any joint defense privilege has been waived, I need not reach the issue of the crime fraud exception to the attorney-client privilege.

Accordingly, the Trustee's motion to compel discovery is granted and Porush's motion for a protective order is denied.  SETTLE ORDER.