Martin POST, Jill Post, Judith A. Dark and William Langlais, on behalf of themselves and others similarly situated, Plaintiffs,

v.

KILLINGTON, LTD., American Skiing Company, SP Land Company, LLC, SP II Resort, LLC, Killington/PICO Ski Resort Partners, LLC, and S–K–I, LTD., Defendants.

No. 2:07–CV–252.

United States District Court, D. Vermont.

July 22, 2009.

Erin Miller Heins, Langrock Sperry & Wool, LLP, Burlington, VT, Mitchell L. Pearl, Peter F. Langrock, William B. Miller, Jr, Langrock Sperry & Wool, LLP, Middlebury, VT, for Plaintiffs.

Alexandra H. Bolanis, Esq., Gary F. Karnedy, Primmer Piper Eggleston & Cramer

PC, Robert B. Hemley, Gravel and Shea, Angela R. Clark, Karen McAndrew, Dinse, Knapp & McAndrew, P.C., Burlington, VT, Alan S. Loewinsohn, Carol E. Farquhar, P. William Stark, Loewinsohn Flegle Deary, LLP, Dallas, TX, for Defendants.

### OPINION and ORDER

JOHN M. CONROY, United States Magistrate Judge.

There are two pending discovery motions in this class action: Plaintiffs' Renewed Motion to Compel documents from SP Land Company, LLC and SP II Resort, LLC ("SP Defendants") (Doc. 148), and the SP Defendants' Renewed Motion to Compel Documents. (Doc. 154). Both motions were previously addressed by this Court's Order of January 14, 2009, which continues to govern the present issues. (Doc. 128). For the reasons stated below the Plaintiffs' Motion to Compel is GRANTED in part and DENIED in part, and the SP Defendants' Motion to Compel is DENIED.

### I. Plaintiffs' Renewed Motion to Compel

In its prior Order, the Court granted Plaintiffs' Motion to Compel Documents from the SP Defendants, but added the proviso that "the SP Defendants may apply for in camera review of any remaining documents that they contend are protected as delineated in this decision." (Doc. 128 at 16). On January 30, 2009, the SP Defendants produced to the Court a set of documents along with a privilege log that was also submitted to Plaintiffs. Now, in their renewed motion, the Plaintiffs contend that a number of these documents are not privileged and therefore must be disclosed.

The Plaintiffs organized the documents they seek into two categories, and attached the relevant lists as Exhibits A (Doc. 148–2) and B (Doc. 148–3).

#### a. Documents Listed in Exhibit A

The Plaintiffs claim that the withheld emails listed in Exhibit A are "communications between non-attorney representatives of separate entities," and therefore must be produced according to this Court's January 14, 2009 Order. (Doc. 148 at 1–3). In that Order the Court found that, under Vermont law, communications between representatives of different corporate clients cannot be privileged if made in the absence of their attorneys. (Doc. 128 at 14); V.R.E. 502(b)(3). The Plaintiffs also argue further that, in any case, the emails are not work product or otherwise privileged as an initial matter.

In response, the SP Defendants offer three points: (1) the Court already determined that eight of the documents sought in Exhibit A are privileged; (2) all of the individuals between whom the remaining communications were shared are representatives of KSRP; and (3) all of the communications are protected by both the attorney/client and work product privileges. (Doc. 153 at 1–5).[1]

First, the SP Defendants are correct that the Court already found that the documents behind SP Defendants' Tab Nos. 24, 28, 31, 34, 35 (P–SP 532), 45, 47, and 48 are privileged. (Doc. 128 at 4). Since the Plaintiffs do not ask the Court to reconsider its decision on such documents (Doc. 155 at 5 n. 3), these emails may continue to be withheld.

With regard to the remaining documents, the Court disagrees with the Defendants' argument that author and recipient Steven Selbo is a "representative" of KSRP. Under V.R.E. 502(a)(2) a "representative of the client" is

(A) a person having authority to obtain professional legal services or act on advice rendered pursuant thereto, on behalf of the client, or (B) any other person who, while acting in the scope of employment for the client, makes or receives a confidential communication necessary to effectuate legal representation for the client.

V.R.E. 502(a)(2); *see also* 12 V.S.A. § 1613. In his sworn statement, Selbo says that "in

---

1. Initially, the SP Defendants also claimed that one document, Bates No. P–SP 67, involves a direct communication to counsel and is therefore privileged. In a July 7, 2009 letter, however, the Defendants informed the Court that this document was produced and is no longer at issue.

the scope of [his] employment as President of *Ski Partners II LLC,* an owner of KSRP, I made and/or received confidential communications necessary to effectuate legal representation of KSRP." (Doc. 153–2 ¶ 10) (emphasis added); *see also* Doc. 153 at 5. Thus it appears that Selbo claims to be a "subsection (B)" representative of KSRP, since he lacks the authority to obtain or act on legal advice.

The difficulty, though, is that subsection (B) requires representatives to make or receive confidential communications "in the scope of employment *for the client.*" Here, Selbo does not claim that he is, or ever was, employed by KSRP, and subsection (B) apparently does not apply to those who accept confidential information on behalf of the client during the course of employment with a *separate entity,* even one that is a part-owner of the client. This is clear not only from a plain reading of the Rule, but also in light of the general Vermont rule that the attorney-client privilege is to be construed narrowly. (Doc. 128 at 13); *see also State v. Rehkop,* 180 Vt. 228, 908 A.2d 488, 494 (2006) (" 'exceptions to the demand for every man's evidence are not lightly created nor expansively construed' ") (quoting *United States v. Nixon,* 418 U.S. 683, 709–710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).[2]

■ Nonetheless, in its January 14 Order the Court already decided that work product shared between representatives of KSRP and the SP Defendants could be withheld as privileged, as evidenced by the number of communications between Selbo and KSRP representatives it permitted to be withheld. These include an email between Selbo and Saskia Groom behind Tab 8, emails between Selbo and Groom, Christopher Nyberg, Tom Horrocks, and Rebecca Greenley (all of KSRP) located behind Tab 13, and an email between Nyberg and Selbo behind Tab 59 of the KSRP documents. (Doc. 128 at 4).[3] Ac-

cordingly, regardless of what theory was relied on to reach that conclusion (e.g. common interest), the Court adheres to it here. After reviewing the content of the Exhibit A emails, it is clear that they were all "prepared 'in anticipation of litigation,' " *United States v. Adlman,* 134 F.3d 1194, 1194–95 (2d Cir.1998) and/or were "made for the purpose of facilitating the rendition of professional legal services," V.R.E. 502(b), and are therefore properly withheld. *See also* Fed.R.Civ.P. 26(b)(3).

### b. Documents Listed in Exhibit B

■ The SP Defendants argue that the documents listed in Exhibit B are properly withheld under the attorney-client privilege because they contain confidential communications either to or from attorneys representing various entities that had a "common interest" in combating the anticipated litigation over the investor passes. (Doc. 153 at 7–13).

The Plaintiffs do not contest the validity of the common interest rule as a general matter, but argue that it cannot apply here because the challenged communications are between representatives of different entities who, at the time, were on opposite sides of a commercial transaction. Since these entities were adverse relative to a pending transaction, the Plaintiffs argue, they could not have possibly held a common interest that would warrant extending the attorney-client privilege to communications between them. (Doc. 148 at 3–6); *see, e.g., SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 512–514 (D.Conn.1976) (finding that when disclosure occurred as part of adversarial business negotiations there was a waiver of the attorney-client privilege).

■ The "common interest" rule "has been described as 'an extension of the attorney client privilege,' [that] serves to protect

---

**2.** At oral argument counsel for the SP Defendants argued that "in the scope of employment for the client" must be read to include employees of the owner of the client, or else corporate owners could never help effectuate legal services for the clients they own. However, there is nothing in the law that would have precluded Selbo from being a "subsection (A)" representative of KSRP, if he was given the "authority to obtain professional legal services or act on ad-

vice rendered pursuant thereto, on behalf of" KSRP. V.R.E. 502(a)(2)(A). But the facts here simply do not support that conclusion.

**3.** The "KSRP documents," which were the subject of the Court's previous discovery order, were produced to the Court for *in camera* review on November 7, 2008.

the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (quoting *Waller v. Fin. Corp. Of America*, 828 F.2d 579, 583 n. 7 (9th Cir.1987)). Only "those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected." *Id.* Finally, the party invoking common interest bears the burden of establishing that the parties agreed to a joint defense strategy, that the challenged communications were made in the course of and to further that strategy, and that all of the remaining elements of attorney-client privilege are satisfied.[4] *United States v. Weissman*, 195 F.3d 96, 99 (2d Cir.1999); *Schwimmer*, 892 F.2d at 244.

In its prior Order, and as briefly stated above, the Court considered only whether the common interest rule could extend the attorney-client privilege over communications between representatives of different clients in the *absence* of their attorneys. (Doc. 128 at 12–15). The Court found that V.R.E. 502(b)(3), in combination with the general requirement to construe that Rule narrowly, precludes that result. *Id.* Accordingly, the Court did not reach a number of questions that are raised again here, namely "whether or when or with whom the Defendants decided to undertake a joint defense strategy, or whether and under what circumstances the common interest rule may apply prior to actual litigation." *Id.* at 15.[5]

The challenged communications in Exhibit B all occurred between March 27 and April 2, 2007, and they were all shared between representatives of entities on opposite sides of the Killington Asset Sale.[6] (Doc. 148–3).

. As the Defendants suggest, "[t]hat a joint defense may be made by somewhat unsteady bedfellows does not in itself negate the existence or viability of the joint defense." *In re Grand Jury Subpoena*, 406 F.Supp. 381, 392 (S.D.N.Y.1975). But even assuming that it is possible for parties engaged in an arms-length commercial transaction to form a joint defense, the question remains whether a joint defense was in fact established. In this case, the critical questions are whether those making and receiving the challenged communications (1) actually had a common interest with respect to the investor passes, and (2) had reached a joint strategy agreement at the time the communications were made.

According to the Defendants' evidence, the SP Defendants were not even aware of the investor passes until March 29, 2007 (Selbo Decl. ¶ 10; Stewart Decl. ¶ 11), more than a full month after the Sales Agreement was signed, but before the deal closed on May 10. Nonetheless, the SP Defendants claim that as of March 29, 2007 the interests of all the defendants[7] were aligned, and they contemporaneously began sharing confidential information as part of a joint defense against potential pass related litigation.

It simply strains credibility, however, to believe that when these passes—completely unknown during due diligence—came to light during the eleventh hour of a complex, high-stakes commercial transaction, parties on op-

---

4. The common interest rule is not an independent form of privilege, but merely permits parties to share otherwise privileged communications with third party counsel without waiving the privilege. *Lugosch v. Congel*, 219 F.R.D. 220, 235–236 (N.D.N.Y.2003).

5. In their Response to Plaintiffs' Motion to Compel (Doc. 153), the SP Defendants urge the Court to construe Plaintiffs' motion on this issue as a "motion to reconsider," and suggest that the Court has already rejected the Plaintiffs' argument that "the common interest rule was inapplicable to the period prior to the closing ... of the Asset Sale." *Id.* at 7–8. This characterization of the Court's prior Order is so inaccurate it warrants little response beyond condemnation.

Not only did the Court not reach this particular question, it decided in the *Plaintiffs' favor* on the issue of whether the common interest rule protected certain deposition testimony. (Doc. 128 at 15).

6. Specifically, the challenged communications are emails shared between counsel and other representatives for ASC and Killington, Ltd. who were sellers in the Killington Asset Sale, and the SP Defendants and Powdr. Corp., who were buyers. (Doc. 148–4).

7. Except for KSRP, with which the SP Defendants allege a common interest as of May 10, 2007.

posite sides of that transaction instantly cast aside their rational economic interests to form a united front against potential litigation. Litigation, incidentally, that would have never occurred but for the new owners' *later* decision not to honor the investor passes and/or that the passes would simply expire after the transaction closed. After all, it was the decision not to honor the passes, not their initial discovery, that created the need to initiate a litigation defense. Indeed the Defendants' own evidence suggests that, at the time they were discovered, the passes were a potential "deal breaker" that threatened the already negotiated transaction. (Selbo Decl. Ex. D).

Nor did the parties share a common interest in making the legal determination of whether the passes would survive the sale. During this process the sellers had an incentive to find that the passes were not binding, and that they would expire upon closing the deal. The buyers, on the other hand, had an incentive to use the newly discovered passes to secure further concessions from the sellers, such as a lower purchase price, or an indemnification agreement to cover future pass-related litigation. Similarly, the parties had competing incentives with respect to evaluating the economic impact of honoring the investor passes.

Given this posture, and absent some clear agreement to the contrary, disclosure of information by someone on one side of the transaction to counsel for someone on the other, would "be inconsistent with the maintenance of secrecy," and would not only "substantially increase[ ] the possibility of an opposing party obtaining the information," but would directly hand it to them. *Lugosch v.*

*Congel,* 219 F.R.D. 220, 235 (N.D.N.Y.2003) (internal quotation marks omitted).

Ultimately, until the new owners decided to close the deal as negotiated and not honor the passes, the investor passes remained within the sphere of negotiation and no cross-transaction common interest could exist.

The declaration evidence submitted by the Defendants does not persuade the Court otherwise.[8] Although the declarations make references to a "common interest" shared between the Defendants in March of 2007, there is not any evidence as to when or how or in what form an actual agreement of common interest and confidentiality was reached. *See Lugosch,* 219 F.R.D. at 237 ("In order ... for documents and communications shared amongst these litigants to be considered confidential, there must exist an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical strategy."). Even if the declarations evidence a subjective belief of common interest on the part of individual company representatives, (Stewart Decl. ¶ 5; Selbo Decl. ¶ 10), that does not suffice to show that a "joint defense effort or strategy [had] been decided upon[.]" *Schwimmer,* 892 F.2d at 243.

Finally, even assuming that the common interest rule may apply prior to the commencement of litigation,[9] it is difficult see how it could apply in this case prior to the decision that the passes would not be honored. At that point there was no "palpable threat of litigation" since the SP Defendants and others could have avoided this litigation entirely by deciding to honor the passes.[10] (Doc. 108 at 11); *see also Lugosch,* 219

---

**8.** Even aside from the facts this evidence fails to assert, it lacks a certain degree of credibility. For example, in Selbo's September 2, 2008 declaration, he says that, as a representative of the SP Defendants, he was "virtually certain" on March 29, 2007 that litigation regarding the ski passes would occur (Decl.¶ 9), even though that was the first day he was even aware of the passes (Decl.¶ 10), and the SP Defendants did not consult counsel until a day later. (Decl.¶ 11).

**9.** Under Vermont law, a client may refuse to disclose otherwise privileged communications made "by him or his representative or his law-

yer, or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a *pending* action and concerning a matter of common interest therein." V.R.E. 502(b)(3) (emphasis added).

**10.** At oral argument counsel for the SP Defendants asserted that all parties involved "immediately" decided on March 29, 2007 that the passes would expire with the asset sale. Unfortunately for the SP Defendants, this mere attorney representation does not suffice when the same conclusion is not supported by the actual evidence in the record.

F.R.D. at 238. And as discussed above, the legal analysis as to whether the passes would survive the transaction is distinct from a legal strategy to defend litigation over those passes, especially with respect to the strategical positioning of the buyers vis-a-vis the sellers. *See also* January 14, 2009 Order at 3 (rejecting application of work product privilege because documents had "little or nothing to do with *preparing a defense* to anticipated litigation[.]") (emphasis added).

It is true that in *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998) the Second Circuit held that analysis regarding the likely outcome of litigation that could result from a yet to be made business decision may be eligible for work product protection under Rule 26(b)(3). But that standard refers only to whether litigation is sufficiently imminent for a related communication to fall within the work product privilege in the first instance, not to whether that privilege should be extended under the common interest rule.

At some point prior to May 10, 2007, all of the Defendants could have agreed that the new owners would not honor the passes, or that the passes would simply expire, and that they would close the deal as negotiated without the buyers obtaining indemnification or any other protection from litigation. Unfortunately, none of the numerous declarations submitted by the Defendants offer any evidence as to when this occurred aside from the final May 10 closing date. Thus, the SP Defendants fail to meet their burden of showing that a common interest and joint defense agreement existed at any point prior to May 10, and therefore all of the documents in Plaintiffs' Exhibit B except for Bates Nos. P–SP 419–420 are not privileged and must be produced. P–SP 419 may be withheld entirely, and only the March 29, 2007 email between Stewart and Van Kirk on P–SP 420 must be produced. The remainder of P–SP 420 may be redacted or otherwise withheld.

## II. SP Defendants' Renewed Motion to Compel

In their Renewed Motion to Compel, the SP Defendants seek two sets of documents they contend are not privileged in light of the January 14 Order. (Doc. 154). First, they seek "all documents evidencing communications between and/or among any Plaintiffs which do not include an attorney as either an author or recipient." Second, they seek "all documents sent to and/or received from internet mailing lists." (Doc. 154). On May 11, 2009, the Plaintiffs produced to the Court for in camera review three binders containing all of their withheld documents that are not direct communications with counsel, including those distributed on email list serves.

■ With regard to communications made between pass holders without their attorneys, this Court explained that although "[c]ommunications among passholders are not generally privileged," they may be withheld when "made specifically for the purpose of facilitating the rendition of legal services to the class." (Doc. 128 at 7); *see also* V.R.E. 502(a), (b). Obviously, then, that communications took place between passholders in the absence of any attorneys does not necessarily preclude application of the attorney-client privilege. Rather, the question is whether the communications were "made specifically for the purpose of facilitating the rendition of legal services to the class."

A review of the Plaintiffs' documents reveals that all of the withheld or redacted communications were indeed made specifically to facilitate the rendition of legal services to the class members. As the Plaintiffs indicated in their May 11 letter to the Court, "the challenged documents [contain] either (1) summaries or paraphrasing of advice or information from prospective counsel before trial counsel was retained, (2) summaries or paraphrasing of advice or information from trial counsel once retained, or (3) comments/questions on drafts of litigation documents or other legal issues from classmembers to counsel."

■ But the SP Defendants argue further that the Plaintiffs fail to satisfy other elements of the attorney client privilege, in particular that the challenged communications were both intended to be and in fact kept confidential. The Defendants point out that for a number of emails on the Plaintiffs' privilege log (Doc. 154 ex. A) the recipients

are listed as "unknown." Without establishing who received the challenged communications, the Defendants argue, the Plaintiffs cannot discharge their duty of proving the existence of the attorney-client privilege in all of its elements. (Doc. 154 at 5).

The Defendants are correct that the burden of establishing the applicability of attorney-client privilege rests with the party asserting it. *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 119 F.3d 210, 214 (2d Cir. 1997). They are also correct that if the recipients of a particular communication are entirely unknown then the burden is not met and the privilege will not lie. (Doc. 128 at 6). However, the Defendants offer no authority to suggest that the Court is restricted to a review of the address line on individual emails to determine whether they are protected by privilege, and indeed concede that the substance of email communications may appropriately be considered.

After reviewing the challenged communications in their entirety, the Court is persuaded that all of the emails were intended to be kept confidential among the Plaintiff classmembers and putative classmembers, and that confidentiality was in fact maintained. For example, although Bates Nos. P 700–P 702 on the Post Privilege Log lists an unknown recipient, the body of the email message itself makes clear that the email was restricted to passholders who were working with counsel to devise a legal strategy. Similarly, Bates Nos. 4745–4748; 4001–4005; and 4007–4011 on the Langlais Redacted Privilege Log all note that "this letter is only being sent to the [members of our legal team]," and the email at Bates No. 04338–4340 admonishes "not [to] share this email with anyone who is not a lifetime passholder. As with all communications regarding our suit it is important to keep this information confidential."

It is true that such contextual evidence does not prove confidentiality with absolute certainty, but neither does an email address line with a particular list of recipients. One of those recipients could later forward the email to a third-party, or the email could additionally contain a "bcc" list of recipients

of whom the party asserting privilege is entirely, and reasonably, unaware. The emails withheld by the Plaintiffs contain highly sensitive and confidential attorney analysis and legal strategy, and the Court finds that the emails themselves, in combination with affidavits submitted by Plaintiffs, provide sufficient evidence to establish the existence of the attorney-client privilege.

■ The SP Defendants make a similar argument with regard to communications delivered via email list serves. They contend that the Plaintiffs do not offer sufficient proof to establish the confidentiality of such communications, stressing that the Plaintiffs admit not knowing the identities of all list serve members at any one time, and that at least one non-classmember joined an email list and received an unknown number of communications before being removed. (Doc. 159 at 7).

In response the Plaintiffs offer the following facts via affidavit: (1) before subscribing to the list, subscribers must identify themselves as Killington lifetime passholders; (2) the subscribers to the lists are instructed to keep communications to the list regarding the litigation confidential and not to share the information with non-passholders; and (3) in the one known instance where an individual that was not a lifetime passholder was found to be subscribed to the email list, that individual was immediately removed from the list. (Segal Aff. ¶¶ 5, 6, 8).

To be sure, these averments leave many questions unanswered. The Plaintiffs have not explained, for example, the process by which individuals join the email lists, or whether or how list membership is monitored, or how the one known non-passholder was identified and how long he or she received confidential communications. On the other hand, in its prior Order the Court already found that the entire class could share confidential information without compromising attorney-client privilege, including during the period before class certification. (Doc. 128 at 7). And it is not reasonable to expect the named Plaintiffs and Plaintiffs' counsel to essentially police every classmember and every person claiming to be a class-

member in order to preserve the privilege on essential communications to the class.

Although the Plaintiffs could have provided more by way of factual support for their assertion of privilege, the Court is convinced they have taken reasonable steps to ensure the confidentiality of communications sent via email lists, and their use of such lists is not inconsistent with the preservation secrecy. *Lugosch v. Congel,* 219 F.R.D. at 235; *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 443 (S.D.N.Y. 1995) ("privilege is waived with respect to [inadvertently disclosed] documents only if the [disclosing] party failed to take reasonable steps to maintain their confidentiality."). Accordingly, the SP Defendants are wrong to argue that the privilege of any communication sent to an email list in this case is per se waived.

Finally, the Court has reviewed all of the Plaintiffs' communications sent to and/or received from email lists and, in accordance with the January 14 Order, they were all made to facilitate the rendition of legal services to the class. Just as the Plaintiffs said, they have withheld "only those [communications] that conveyed legal advice or information from counsel to the class, or sought' information from the class at the request of counsel." (Doc. 156 at 4–5).

### CONCLUSION

For all of the foregoing reasons, the Plaintiffs' Renewed Motion to Compel (Doc. 148) is GRANTED in part and DENIED in part, and the SP Defendants' Renewed Motion to Compel (Doc. 154) is DENIED. The SP Defendants are hereby ordered to make further document production in accordance with this Opinion and Order.