**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

LUIS ALBERTO GONZALEZ,
           *Defendant-Appellant.*

No. 11-15025

D.C. No.
3:06-cr-00710-
WHA-2

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted
November 15, 2011—San Francisco, California

Filed January 25, 2012

Before: Michael Daly Hawkins and Milan D. Smith, Jr.,
Circuit Judges, and Kevin Thomas Duffy, District Judge.*

Opinion by Judge Hawkins

*The Honorable Kevin Thomas Duffy, United States District Court Judge for the Southern District of New York, sitting by designation.

719

**COUNSEL**

Daniel P. Blank, Assistant Federal Public Defender, San Francisco, California, for the defendant-appellant.

Robert David Rees, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

---

**OPINION**

HAWKINS, Senior Circuit Judge:

In this interlocutory appeal, Luis Alberto Gonzalez ("Gonzalez") challenges an order denying his motion to quash a subpoena in a section 2255[1] habeas proceeding brought by his wife, Katherine Elizabeth Paiz ("Paiz"). Gonzalez and Paiz were convicted in separate trials of fraud arising from an insurance scam involving Paiz's car. The car was found burned in a field with a gas can in the backseat shortly after the pair discovered the car needed several thousand dollars of repairs not covered by warranty, and ten days after Paiz took out an insurance policy on the vehicle. Although both separately confessed to the fraud, Paiz claimed she had no knowledge that fire would be used to destroy the car. Gonzalez initially told FBI agents that he had burned the car but that his wife knew nothing about it. The trial court severed the trials when Gonzalez announced he intended to testify at his wife's trial regarding the use of fire count (which carried a mandatory minimum ten-year sentence). *See* 18 U.S.C. § 844(h).

However, shortly before his own trial, Gonzalez indicated his defense would be that he had nothing at all to do with the crime and that he had lied to the FBI about his involvement to protect his wife. He was convicted of three fraud counts,

---

[1]28 U.S.C. § 2255.

but acquitted of the use of fire count, and sentenced to ninety-six months in prison.

Paiz's attorney, Nina Wilder ("Wilder") ultimately decided not to call Gonzalez as a witness at Paiz's trial. Paiz was convicted on all counts, and sentenced to 121 months in prison. In her section 2255 petition, Paiz now alleges that Wilder provided ineffective assistance of counsel by failing to call Gonzalez as a witness. Gonzalez intervened to seek quashal of the subpoenas directed at Wilder on the basis of a joint defense privilege.

## FACTS AND PROCEDURAL HISTORY

In September 2010, Paiz filed a motion in district court to set aside her conviction for ineffective assistance of counsel. One of her claims was that Wilder was ineffective for failing to call Gonzalez as an exculpatory witness.

The government sought a deposition subpoena and subpoena duces tecum for Wilder. It specifically sought discovery regarding Wilder's statements to the district court during an *ex parte* hearing, including communications Wilder had received from Gonzalez's counsel around that time, relating to Gonzalez's potential testimony at Paiz's trial. The court granted the motion and directed that the deposition proceed.

Gonzalez filed an emergency motion to quash or modify the subpoenas on the basis of a joint defense privilege. His counsel submitted a declaration claiming that he and Wilder had "met and discussed confidential information related to trial preparation" and that although there was no written joint defense agreement ("JDA"), these communications were "for the purpose of preparing a joint defense strategy" and the "clear understanding was that such communications were privileged."

The district court ordered that the deposition of Wilder go forward, but provided that counsel for Gonzalez and Paiz

could attend and object to questions that they believed were privileged. The court also imposed a protective order limiting the use of any disclosed material to litigating Paiz's section 2255 motion.

During the deposition, Gonzalez's counsel objected to several questions on the basis of the joint defense privilege, and Wilder also frequently claimed that questions called for protected information. Like Gonzalez's counsel, Wilder indicated there was no written JDA, but an "implied agreement." At the deposition, Wilder reasoned: "We understood between ourselves that everything we said would be confidential," and "[w]e agreed there would be a joint defense and that we would share information."

After additional briefing, the district court issued an order denying the motions to quash, holding that "when a claim of ineffective assistance of counsel is asserted in a collateral challenge to a conviction, all information to and from trial counsel plausibly relevant to the alleged acts or omissions is discoverable." *United States v. Paiz*, No. CR 06-710 WHA, 2010 WL 5399216, at *1 (N.D. Cal. Dec. 23, 2010). The court concluded that even assuming a JDA existed, Gonzalez's joint defense privilege must yield to the discovery needs created by Paiz's ineffective assistance claim. The court ordered Wilder's deposition to continue and that she answer all relevant questions posed to her, but stayed the order pending this interlocutory appeal. *Id.* at *12. We now reverse and remand to the district court.[2]

---

[2]We have jurisdiction over this appeal pursuant to *Perlman v. United States*, 247 U.S. 7 (1918): "We have interpreted *Perlman* to mean that a discovery order directed at a 'disinterested third-party custodian of privileged documents' is immediately appealable because the 'third party . . . would most likely produce the documents rather than submit to a contempt citation.' " *United States v. Griffin*, 440 F.3d 1138, 1143 (9th Cir. 2006) (citation omitted).

## STANDARD OF REVIEW

A district court's conclusions whether information is protected by attorney-client privilege is a mixed question of law and fact which this court reviews de novo. *United States v. Richey*, 632 F.3d 559, 563 (9th Cir. 2011).

## DISCUSSION

### I.  The Joint Defense Privilege

The joint defense privilege was first recognized by our court in *Continental Oil Co. v. United States*, 330 F.2d 347 (9th Cir. 1964). Employees of two different oil companies had been summonsed to testify before the Grand Jury; each was interviewed by their respective counsel. Counsel then prepared memoranda about the information received and "exchanged such memoranda in confidence in order to apprise each other as to the nature and scope of the inquiry proceeding before the Grand Jury" and "to make their representation of their clients in connection with the Grand Jury investigation and any resulting litigation, more effective." *Id.* at 348-49. When the government later sought to discover these memoranda, asserting that the attorney-client privilege had been waived by disclosing the information to third parties, we rejected the claim and ordered the subpoena quashed. *Id.* at 350.

We reasoned that the communication was made for the "limited and restricted purpose to assist in asserting their common claims" and that thus "the recipient of the copy stands under the same restraints arising from the privileged character of the document as the counsel who furnished it, and consequently he has no right, and cannot be compelled, to produce or disclose its contents." *Id.* (quotation omitted); *see also Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965) ("[W]here two or more persons who are subject to possible indictment in connection with the same transactions

make confidential statements to their attorneys, these statements, even though they are exchanged between the attorneys, should be privileged to the extent that they concern common issues and are intended to facilitate representation in possible subsequent proceedings.").

**[1]** The Ninth Circuit has long recognized that the joint defense privilege is "an extension of the attorney-client privilege." *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000) (explaining that a JDA had established an implied attorney-client relationship between the codefendants and their counsel)*; see also United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005) (recognizing joint defense privilege as extension of attorney client privilege that "protects not only the confidentiality of communications passing from a party to his or her attorney but also 'from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel' ") (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)). The privilege is also referred to as the "common interest" privilege or doctrine, because it has not been limited to criminal defense situations or even situations in which litigation has commenced:

> Whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.

*In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990).

Here, the district court assumed for the sake of argument that an implied JDA existed, but nonetheless held that no such

agreement "should or can be allowed to bar discovery or use of pertinent communications to and from trial counsel in a later Section 2255 proceeding." 2010 WL 5399216, at *11. The court reasoned that the "joint defense agreement does not create a duty of loyalty to an individual who is not one's own client, and it is not the same as joint representation." *Id.* at *8. The court thus concluded that communications between counsel are more appropriately characterized as "work product communications, intended to aid in preparation for litigation," and that such privilege is not absolute; the court went on to hold that there existed the required "necessity and unavailability by other means" for discovery of the work product. *Id.* at *8-9; *see* Fed. R. Civ. P. 26(b)(3).

On appeal, the government does not advance the rationale proffered by the district court.[3] Rather, it argues that (1) Gonzalez did not sufficiently establish on the record that a JDA actually existed, (2) that such an agreement could not exist in the circumstances here, where Gonzalez's defense was adverse to Paiz's, and (3) even if one existed, the court correctly held that Paiz's section 2255 claim acted as a unilateral waiver of the privilege in these circumstances.

## II.   Existence of a Joint Defense Agreement

Noting that we may affirm on any ground supported by the record, the government suggests that we need not reach the broader question of whether Paiz's section 2255 motion waived the joint defense privilege as to Gonzalez's communications. It contends Gonzalez has not even established the existence of a JDA. *See United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (party asserting the attorney-client privilege has the burden of establishing the existence of the relationship and the privileged nature of the communication).

---

[3]We address the district court's reasoning in Section III, below.

The government first characterizes the district court's decision as concluding that "the actual record is too thin" to support the contention that a JDA existed. 2010 WL 5399216, at *11. But the court went on to state that there was possibly an "implied joint defense agreement, one arising from a course of conduct," and ultimately concluded that the JDA's existence was irrelevant because "the main holding of this order is that no joint defendant agreement, no matter how plain and clear, should or can be allowed to bar discovery or use of pertinent communications to and from trial counsel in a later Section 2255 proceeding." *Id.*

**[2]** The district court thus made no express finding regarding the existence of an agreement and it is clear that the court instead "assumed for the sake of argument that there was a joint defense agreement." *Id.* More importantly, it is clear that no written agreement is required, and that a JDA may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation. *Cont'l Oil*, 330 F.2d at 350 (privilege applies even "without an express understanding that the recipient shall not communicate the contents thereof to others") (quotation omitted); *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (it may reasonably be inferred from consultation among clients and counsel allied in common legal cause that disclosures are confidential); *HSH Nordbank AG v. Swerdlow*, 259 F.R.D. 64, 72 n.12 (S.D.N.Y. 2009) (noting joint agreement need not be in writing to protect a communication); *Avocent Redmond Corp. v. Rose Elecs., Inc.*, 516 F. Supp. 2d 1199, 1203 (W.D. Wash. 2007) ("a written agreement is not required" to invoke the joint defense privilege).

**[3]** Here, there was sufficient evidence in the record to support the existence of a JDA, at least to a point. Gonzalez's counsel filed a declaration asserting:

[A]s the case progressed, [Ms. Wilder and I] met and discussed confidential information related to trial preparation, sometimes in the presence of the clients and sometimes not. Although there was no written joint defense agreement, this communication among Mr. Gonzalez and Ms. Paiz and their counsel was for the purpose of preparing a joint defense strategy and involved the sharing of confidential information. The clear understanding was that such communications were privileged.

At her deposition, Wilder testified similarly that the JDA started "from the beginning of the case," and that it was an "implied agreement." "We understood between ourselves that everything we said would be confidential." She further stated: "I think that the joint defense agreement was formed when we sat down and agreed to jointly strategize in the case and to share information. That's the basis we agreed to" and "[i]n our initial conversation we agreed to proceed jointly and share confidential information." Wilder acknowledged there was no written JDA or any emails about one to her knowledge, but that "at some point we certainly discussed, and repeatedly, I think, at various points, talked about the fact that it was a joint defense agreement, that there was a joint defense, that we share confidential information, which is the whole point of the joint defense."

**[4]** The government argues that notwithstanding these assertions of a joint defense and strategy, the legal interests of Gonzalez and Paiz lacked sufficient commonality, especially at the point the trials were severed or, if not then, when Gonzalez announced a defense that was demonstrably adverse to the interests of Paiz by blaming her for the crime. The government acknowledges that parties to an asserted JDA need not have identical interests and may even have some adverse motives, *see Hunydee*, 355 F.2d at 185, but correctly points out that the attorneys do, at a minimum, need to be "engaged in maintaining substantially the same cause on behalf of other

parties in the same litigation." *Cont'l Oil*, 330 F.2d at 350; *see also Hunydee*, 355 F.2d at 185 (communications are privileged "*to the extent* that they concern common issues and are intended to facilitate representation") (emphasis added).

**[5]** Here, even if Gonzalez and Paiz began as codefendants with aligned interests, they later moved simultaneously to sever their trials from one another; the government argues "it is inherently contradictory simultaneously to claim to be in a joint defense agreement and also that a joint trial is legally prohibited." This is not necessarily true, however, as parties in separate actions might nonetheless have reasons to work together toward a common objective, and there is no requirement that actual litigation even be in progress. *Cont'l Oil*, 330 F.2d at 350; *United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996) (unnecessary that there be actual litigation in progress for privilege to apply). For example, here the trials were initially severed so that Gonzalez could aid Paiz by testifying at her trial. In addition, attorney Wilder testified that she and Gonzalez's counsel continued to meet and discuss the cases after the severance was granted.

However, Wilder also testified that the first time she learned of Gonzalez's plan to blame his wife for the insurance scam occurred "shortly before trial" and around the same time Gonzalez publicly disclosed the defense. She also testified she did not know at the time she filed the severance motion that Gonzalez would claim he had lied to federal agents to protect Paiz as the truly guilty party. The government contends that one party being kept in the dark about such crucial information is strong evidence that no true JDA existed. In addition, Gonzalez's defense was completely antagonistic to Paiz's—blaming her entirely for the crime while asserting his own innocence. It is debatable whether Gonzalez could have reasonably believed by this point that he and his wife were continuing to pursue a joint defense arrangement. *See Schwimmer*, 892 F.2d at 244 (common interest rule requires

communication to be given in confidence and that the client reasonably understood it to be so given).

Gonzalez maintains that notwithstanding his shift in defense theories, he remained consistently committed to Paiz's defense on the use-of-fire count—that she was guilty of fraud but had no knowledge that the car would be burned. If their mutual interest is defined more narrowly in this way, then it is possible that their other adverse positions did not undermine their joint defense privilege on this specific issue.

**[6]** As the foregoing discussion illustrates, the existence of a JDA is not necessarily an all-or-nothing proposition, and may be created (and ended) by conduct as well as express agreement. The timeline of events and the facts of this case could suggest that a JDA existed at the outset between the parties and their counsel, but that it had ended at least by the time Gonzalez decided to pursue his own defense and blame Paiz for the crime (thus ending their common legal interests). *See In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005) (affirming district court factual finding that common interest agreement did not exist prior to December 2001, so disclosures made prior to that time were not privileged); *see also Gilson v. Sirmons*, No. CIV-01-1311-C, 2006 WL 2320682, at *30 (W.D. Okla. 2006) (noting trial court had conducted an *in camera* hearing and determined that a JDA existed at least prior to the severance of the cases, and that any information gained in confidence during the existence of those joint defense efforts remained protected by attorney-client privilege). Alternatively, it may also be that Paiz's and Gonzalez's "joint defense" strategy always related only to the use-of-fire charge and that they remained committed on this point notwithstanding other defense changes.

**[7]** The record at least establishes the existence of a JDA (either an express verbal agreement or one implied from conduct), but the court made no specific findings regarding the extent or duration of that JDA. We therefore remand to the

trial court for an (*in camera*) evidentiary hearing to expressly determine: (1) if the JDA implicitly ended at some point, (2) if so, when, and (3) when the relevant communication here (the ultimate representation regarding what Gonzalez would testify to at Paiz's trial) was made. If the communication occurred during the existence of the JDA, then it remains protected, as discussed further below. On the other hand, if it was made after the joint defense efforts ended, and when Gonzalez was merely a potential trial witness for Paiz, then that specific communication to Paiz's counsel may not be privileged (though any prior statements made or communicated to her during the JDA would remain protected). *See Schwimmer*, 892 F.2d at 243 (only communications made in course of ongoing common enterprise and intended to further that enterprise are protected).

## III.   Unilateral Waiver by Section 2255 Motion

**[8]** In ruling that Gonzalez's communications to Wilder were nonetheless discoverable, the district court first concluded that they should be treated more as "work product communications" rather than "true privilege[d]" statements. 2010 WL 5399216, at *8-9. It then held that they were discoverable because of the necessity and unavailability of other means of discovering such work product. *Id.* This ruling conflicts with a number of this circuit's precedents establishing that the joint defense privilege *is* an extension of the attorney-client privilege, and *does* establish a duty of confidentiality on the part of the additional attorney and party to the agreement. *Hunydee*, 355 F.2d at 185; *Cont'l Oil*, 332 F.2d at 350*; see also Austin*, 416 F.3d at 1021; *United States v. Stepney*, 246 F. Supp. 2d 1069, 1077 (N.D. Cal. 2003). This distinction is important because "[p]rivilege cannot be overcome by a showing of need, whereas a showing of need may justify discovery of an attorney's work product." *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494-95 (9th Cir. 1989) (quotation omitted).

**[9]** Moreover, the case law is clear that one party to a JDA cannot unilaterally waive the privilege for other holders. *See United States v. BDO Seidman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007) (The "privileged status of communications falling within the common interest doctrine cannot be waived without the consent of all of the parties."); *John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 556 (8th Cir. 1990) (joint defense privilege cannot be waived without the consent of all parties to the defense); *In re Grand Jury Subpoenas*, 902 F.2d at 250 (holding that all documents related to common claim "are subject to a joint defense privilege that [one party] may not waive unilaterally"). The Restatement similarly indicates that one party to a common-interest arrangement lacks the ability to waive the privilege as to other members:

> Any member of a common-interest arrangement may invoke the privilege against third persons, even if the communication in question was not originally made by or addressed to the objecting member. . . . Any member may waive the privilege with respect to that person's own communications. Correlatively, a member is not authorized to waive the privilege for another member's communication.

Restatement (Third) of the Law Governing Lawyers § 76, cmt. g. (2000).

Nonetheless, the government argues that Paiz's filing of the section 2255 motion can act as a unilateral waiver of the privilege as to both her communications and those made by Gonzalez. To support its argument, the government cites to a number of cases in which co-clients (represented by the same attorney) later become involved in disputes with one another. *See, e.g.*, *In re Teleglobe Commc'ns Co.*, 493 F.3d 345, 366 (3d Cir. 2007) ("When former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable."); *FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000) (joint defense privi-

lege "inapplicable to disputes between joint clients"). These cases are inapposite, however, as Paiz and Gonzalez were not co-clients with the same counsel, and, moreover, are not adverse parties in this habeas litigation.

The district court relied on this court's decision in *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), in which we noted the longstanding rule that "where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer." *Id.* at 716. We explained that there is an implied choice to the holder of the privilege: "If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it." *Id.* at 720. In *Bittaker*, we relied on notions of fairness, and balanced the need for discovery against the petitioner's claim of privilege. *Id.* at 720-22. Here, although noting that *Bittaker* involved the waiver of the petitioner's *own* claim of privilege and not that of a third party, the district court relied on these underlying considerations to conclude that Gonzalez's interest in confidentiality should also yield because he faced no consequences from disclosure and yet the petition could not be fully and fairly resolved without it.

**[10]** While the district court identified valid concerns, they represent only half of the equation presented in *Bittaker* and the long line of cases decided before it: the holder of the privilege has a choice. "[T]he holder of the privilege may preserve the confidentiality of the privileged communications by choosing to abandon the claim that gives rise to the waiver condition." *Id.* at 721. Gonzalez, of course, is presented with no such choice and is an unwilling third-party participant in this habeas proceeding. Thus, a *Bittaker*-type balancing test does not work here, where Gonzalez has not filed a petition and thus has not *chosen* to put his communications at issue. In addition, allowing unilateral waiver of confidential communications by a single codefendant without the consent of

the others would likely severely undermine the rationale for the joint defense privilege in the first place. *See Schwimmer*, 892 F.2d at 243 (a lawyer's "assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure," and joint defense privilege is an extension of that attorney-client privilege) (internal quotation omitted).

**[11]** For the foregoing reasons, we conclude the district court's analyses regarding privilege versus work product and unilateral waiver by filing the section 2255 petition were in error, and reverse and remand for further proceedings consistent with this Opinion.

## CONCLUSION

It appears that for at least part of the proceedings, Gonzalez and Paiz were part of a JDA, either express or implied. However, it also appears possible that at some point that arrangement ended, such as when Gonzalez decided to pursue his own self-serving defense and blame Paiz for the crime rather than pursuing a jointly beneficial defense strategy. Therefore, we remand to the district court for an *in camera* evidentiary hearing to determine if and when the JDA ended, and when the communication at issue here (what Gonzalez would ultimately testify to at Paiz's trial) was made.

**REVERSED AND REMANDED**.