**FIREMAN'S FUND INS. CO.,
et al., Plaintiffs,**

v.

**GREAT AM. INS. CO. OF N.Y.,
et al., Defendants.**

No. 10 Civ. 1653(JPO)(JLC).

United States District Court,
S.D. New York.

July 3, 2012.

133

John Anthony Vincent Nicoletti, Nicoletti Hornig & Sweeney, New York, NY, for Plaintiffs.

George Richard Zacharkow, Stephen J. Galati, Mattioni, Ltd., Philadelphia, PA, Meryl R. Lieberman, Stephen D. Straus, Hawthorne, NY, for Defendants.

## MEMORANDUM AND ORDER

JAMES L. COTT, United States Magistrate Judge.

This insurance coverage case arises out of the August 2009 sinking and salvage of a dry dock formerly located off-shore in Port Arthur, Texas ("the dry dock"). The dry dock

was owned and operated at all relevant times by Defendant Signal International, LLC ("Signal"). Several insurance policies issued to Signal are implicated in the case, including an excess commercial property policy issued by Defendant Max Specialty Insurance Co. ("Max"), a vessel owner pollution liability policy issued by Defendant Great American Insurance Company of New York, and a primary and excess marine general liability policy issued by Plaintiff Fireman's Fund Insurance Company.

Signal and Max have presented discovery disputes to the Court for resolution. Signal has moved to compel Max to produce certain claims file documents and documents from its former law firm, and to compel Max to produce the file of its reinsurer, Arch Re Facultative Insurance Company ("Arch Re"), as it pertains to the sinking of the dry dock, as well as any other documents or communications related to reinsurance policies Max obtained regarding the dry dock. Max has moved to compel Signal to produce certain business and maintenance records related to its operation of a dry dock located in Mississippi.

■■■ "A district court has wide latitude to determine the scope of discovery." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir.2008); *see also S.E.C. v. Rajaratnam*, 622 F.3d 159, 180–81 (2d Cir.2010) (discussing discretion of district court to manage discovery). Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that a party is entitled to discovery on "any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). Discoverability is determined by the broad standard of relevance. *See Oppenheimer Fund., Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). "The burden of demonstrating relevance is on the party seeking discovery.... Once relevance has been shown, it is up to the responding party to justify curtailing discovery." *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y.2011) (citation omitted); *see also* Fed.R.Civ.P. 26(b)(5)(A); Local Civil Rule 26.2.

Applying these well-established principles to the present dispute, for the reasons set forth below the Court grants Signal's motion as it relates to the Arch Re file and any other reinsurance documents related to the excess policy Max issued to Signal, reserves decision pending a hearing scheduled by separate order issued today as to the request for the production of Max's claims file and any documents relating to Signal's claim from Max's former law firm, and grants Max's motion in part and denies it in part.

## I. *Signal's Motion to Compel*

### A. Signal's Requested Discovery and Max's Response

Signal seeks the production of the following documents:

- Any documents in Max's possession responsive to Signal's request for production of reinsurance communications or documents;
- Any documents responsive to the subpoena issued to Arch Re on June 30, 2011 that were turned over to Max and over which Max has asserted privilege;
- Max's complete claims file, including all file notes and the claim memorandum referenced by Max claims manager Cody Whittington during his deposition; and
- Any and all documents in Max's possession constituting reports or updates on Signal's claim from the Nourse & Bowles law firm.

Signal specifically requests that the Court compel the production of the unredacted version of these documents, or alternatively conduct an *in camera* review of the documents to determine whether Max's assertion of privilege can be maintained. (Memorandum in Support of Signal International, L.L.C.'s Motion to Compel Max Specialty/Arch Re's Response to Discovery Requests ("Signal Mem."), at 2 (Dkt. No. 145)).

Max has responded by arguing that Signal has "offer[ed] no argument as to why reinsurance communications are relevant to this lawsuit," and that the reinsurance documents it seeks, along with the portions of Max's claims file and Nourse & Bowles' file that it has not yet produced, are protected from disclosure by the attorney-client privilege or

work product doctrine. (Memorandum of Law in Opposition to Defendant Signal International, LLC's Motion to Compel ("Max Opp. Mem."), at 1 (Dkt. No. 149)).

## B. Reinsurance Documents

### 1. *The Parties' Positions*

As noted above, Signal seeks two categories of documents related to the reinsurance policies Max obtained from Arch Re. First, Signal seeks from Max all documents or communications related to Max's procurement of, and claims made on, its reinsurance policy on the dry dock. (Signal Mem. at 2). Second, Signal seeks all documents contained within the file that Arch Re maintained on the dry dock, which Signal originally sought by subpoena directed to Arch Re. (Signal Mem. at 3). After Max objected to the subpoena on the grounds that the information was protected by the common interest doctrine, Arch Re turned the file over to Max. (*Id.; see also* Letter to the Court from Meryl R. Lieberman dated Aug. 29, 2011 at 1–2 (first raising Max's objection to the subpoena)). In its motion, Signal contends that Max has failed to establish that the common interest doctrine applies to either of the two categories of documents it seeks and that, even if the common interest doctrine did apply, Max has failed to establish the existence of an underlying privilege. (*Id.* at 8).

In opposition, Max objects to Signal's requests for reinsurance information on two grounds—relevance and the common interest doctrine. (Max Opp. Mem. at 11–15). As a preliminary matter, however, Max informs the Court that it has "now served nearly all documents within the Arch Re file pertaining to the AFDB–5 dry dock in order to reflect documents which were produced by Max's prior counsel[,]" although it did so without conceding the relevance of the reinsurance information. (Max. Opp. Mem. at 11–12 & n. 3). Max has submitted a "revised privilege

log," enumerating the documents from the Arch Re file that it continues to withhold. (Declaration of Stephen D. Straus dated Apr. 26, 2011 ("April 26 Straus Decl."), Exhibit ("Ex.") D (Dkt. No. 147–4)). The revised privilege log reflects only thirteen entries, as opposed to the nearly 170 documents listed on the original privilege log. (Signal Mem., Ex. B (Dkt. No. 145–1)). The revised privilege log states that the "[b]asis for [w]ithholding or [r]edacting" documents Bates-stamped ARCH 52, 59, 167 and 169 is "Relevance," while the other entries list either "Reserves" (Bates Nos. ARCH 59, 98, 99, 100, and 166–69) or "Bank Numbers, Account Numbers" (Bates Nos. ARCH 57, 58, 81, and 89) as the basis for withholding. (*See also* Max Opp. Mem. at 12). All but four documents are only "partially redacted." (April 26 Straus Decl., Ex. D). Therefore, it appears that Max has not asserted a privilege objection to any of these 13 documents within the Arch Re file.[1]

As to the other reinsurance documents Max has withheld, Max asserts that any "[p]rivileged and/or otherwise protected information exchanged with Arch Re is ... protected from disclosure by the common interest privilege" because Max and Arch Re "have a joint legal interest in the outcome of th[e] litigation" concerning the dry dock. (Max Opp. Mem. at 14). It contends as much because "resolution of Signal's coverage claims and Max's rescission claim directly impacts what funds may be returned to Arch Re or which Arch Re may be additionally obligated to pay." (*Id.*). To that end, Max has submitted a privilege log entitled "Amended Production—December 15, 2011" that contains 17 entries concerning communications with its reinsurer. (April 26 Straus Decl., Ex. C (Dkt. No. 147–3)).

■ This amended privilege log asserts four categories of privilege: (1) "material prepared in anticipation of litigation or trial"

---

1. Given that there is nothing in the record to suggest that bank account numbers would be relevant to this dispute and because the revised privilege log shows that the four documents marked "Bank Numbers, Account Numbers" have only been partially redacted (*id.*), the Court will not compel disclosure of this information absent showing of good cause to do so. More-

over, the Court observes that such information is often protected from disclosure pursuant to confidentiality agreements and would be, in any event, redacted prior to any public filing under Local Civil Rule 5.2. *See, e.g., Koch v. Greenberg,* No. 07 Civ. 9600(BSJ)(DF), 2012 WL 1449186, at *13 (S.D.N.Y. Apr. 13, 2012).

("MPL"); (2) "attorney/client privilege"; (3) "[p]rivilege[ ] based on [c]ommon [i]nterest"; and (4) "[w]ork [p]roduct [p]rivilege." (*Id.*). Notably however, about 40 entries reflect no designation of privilege (*i.e.*, the space for such a designation is blank), and each of the 17 entries related to reinsurance assert "relevance" as one of the asserted "privilege" claims. (*Id.*). Max has marked 86 entries on this amended privilege log as CI ("[p]rivileged based on [c]ommon [i]nterest"), with each entry also reflecting an additional ground for privilege, either MPL ("material prepared in anticipation of litigation") or ACP ("attorney/client privilege") or both, but never WP ("[w]ork [p]roduct [p]rivilege"). (April 26 Straus Decl., Ex. C).[2]

## 2. *Relevance of Reinsurance Documents*

As noted, Signal has asserted relevance as a basis for withholding documents in the Arch Re file and other documents reflecting communications with its reinsurer. Although the "case law is sparse within the Second Circuit" concerning the discoverability of reinsurance information, "the few cases to consider the issue have determined that reinsurance information is indeed discoverable." *Suffolk Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 270 F.R.D. 141, 142 (E.D.N.Y. 2010) (citations omitted); *see also* Lee R. Russ, *Couch on Insurance*, vol. 17A, § 251:30 (3d ed. 2011) (enumerating reasons for permitting such discovery and collecting cases). While Max cites several cases for the opposite proposition, that "reinsurance information is generally irrelevant" (Max Opp. Mem. at 11), each of the cases was decided by courts outside the Second Circuit and involves distinguishable facts.[3]

Signal does not explicitly address in its motion the relevance of either the documents in the Arch Re file or the other reinsurance documents, likely because the objections Max raised prior to Signal's motion related primarily to privilege. However, at the September 15, 2011 discovery conference, counsel for Signal touched upon the relevance of the reinsurance documents, particularly those contained in the Arch Re file. While counsel acknowledged that he did not know specifically what was in the file, he surmised that it might contain a document reflecting "a rating formula to decide how to price the insurance." (Transcript of September 15, 2011 Proceeding ("Tr.") 5:14–15 (Dkt. No. 126)). He argued that such a document:

> would be extremely relevant if, in looking at that formula, the age of the dry dock, the condition of the dry dock, the last survey date for the dry dock is factored into the formula because we're being accused of fraud in not disclosing certain information. This was a 60–year–old dry dock and everyone knew it. If Arch, for example, set a premium without taking into consideration the age and condition of the dry dock, that becomes relevant to my mind on a scienter and other basis for saying what are we arguing about fraud here.

(Tr. at 5:16–24). Therefore, Signal's primary purpose in obtaining these documents is apparently to rebut Max's cross-claims concerning Signal's alleged "concealments, misrepresentations and fraud as to the condition and value of the AFDB–5" dry dock. (Max Specialty's Amended Answers to Signal's Cross-claims with Amended Additional Crossclaims against Signal dated Feb. 18, 2011 ¶ 119 (Dkt. No. 89); *see also* Second Amended Answer of Defendant Max Specialty Insurance Company dated Mar. 18, 2011 ¶ F (asserting additional crossclaims against Signal

---

**2.** *It is not clear what distinction Max is making between "material prepared in anticipation of litigation," which normally would be considered work product-protected, and "work product privilege." See, e.g., Bogan v. Nw. Mut. Life Ins. Co.*, 163 F.R.D. 460, 463 (S.D.N.Y.1995) ("party seeking concealment behind the work-product shield must establish that the documents at issue were prepared in anticipation of litigation"). *To the extent Max is invoking New York law by citing to "MPL," it is inapposite as "federal law governs the applicability of the work product doctrine in*

all actions in federal court." *Calabro v. Stone*, 225 F.R.D. 96, 98–99 (E.D.N.Y.2004) (quotations omitted).

**3.** Max's citation to *Gold Fields American Corp. v. Aetna Casualty & Surety Co.*, 1994 N.Y. Misc. LEXIS 709 (Sup.Ct.N.Y.Cnty. Feb. 24, 1994), a decision by the New York State Supreme Court, is also inapposite, and in any event, in that case the court permitted limited discovery of reinsurance documents. *Id.* at *18.

for declaratory judgment that the excess insurance policy it issued is void because of Signal's fraud) (Dkt. No. 101)).[4]

Signal's relevance arguments parallel those in *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, No. 86 Civ. 9671(SWK), 1988 WL 96159, at *5 (S.D.N.Y. Sept. 6, 1988). In that case, plaintiff, a company that manufactured asbestos-containing products, sought reinsurance documents from defendant, its insurer. *Id.* at *1, 5. Plaintiff argued that reinsurance documents could "reflect an insurer's understanding of the risk it underwrote and thereby rebut the defense, raised by several insurers, that [plaintiff] failed to disclose information sufficient to apprise the insurer of that risk" and that the insurer's notice of claim to its reinsurer "may evidence the insurer's understanding of the underlying claims and may contain admissions that these claims are covered." *Id.* at *5. The insurer argued essentially that its reinsurance information reflected speculative and actuarial business decisions and was therefore irrelevant to the action. *Id.* The court permitted the discovery and noted that "[i]n this circuit, discovery of reinsurance information has been allowed, and thus has presumably been found to be relevant." *Id.* (citations omitted).

■ The court's rationale in *Stonewall* and the broad scope of discovery permitted by Rule 26, combined with the fact that Max's cross-claim asserting fraud puts what Max told Arch Re about the dry dock (and what Arch Re otherwise knew about it) into issue, persuade this Court that Max's position that reinsurance documents are generally irrelevant is an insufficient basis to withhold them. Accordingly, to the extent Max relies on relevance as a basis for withholding any documents, it is directed to produce those documents unless some other viable ground for withholding exists. As Max has not cited any basis other than relevance for withholding or redacting documents Bates-stamped ARCH 52, 59, 167 and 169, Max is directed to produce these documents in their entirety.

■ Additionally, Max asserts a specific relevance objection to Signal's subpoena of the Arch Re file to the extent the Arch Re file contains information on loss reserves. Max contends that "[o]ther than claiming blanket entitlement to the entirety of the Arch Re file, Signal does not specifically seek reserve information and thus makes no argument that reserve information is relevant in the instant lawsuit." (Max Opp. Mem. at 12). Max adds that "reserve information has been found to be generally irrelevant in insurance coverage actions." (Max Opp. Mem. at 12 (citing cases)). As an initial matter, it is well-established that "[a] subpoena need not specify all the particular items sought where they are not all known, but may simply require production of all documents pertaining to a specified matter or issue." *Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir. 1981) (citing C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2454, at 428 (1971)); *accord Morse/Diesel Inc. v. Fid. & Deposit Co.*, 122 F.R.D. 447, 449 (S.D.N.Y. 1988) (noting discovery is relevant under Rule 26(b)(1) if it "appears reasonably calculated to lead to the discovery of admissible evidence" and defining "reasonably calculated" to mean "any possibility that the information sought may be relevant to" any claim or defense) (quoting *Mallinckrodt Chem. Works v. Goldman, Sachs & Co.*, 58 F.R.D. 348, 353 (S.D.N.Y.1973) (examining "reasonable particularity" requirement under Rule 34)). Therefore, Max is not entitled to withhold loss reserve information simply because Signal did not specifically articulate a demand for that information in its subpoena to Arch Re.

Moreover, while Max cites several cases for the proposition that reserve information is "generally irrelevant in insurance coverage actions" (Max Opp. Mem. at 12), its position is belied by several more recent decisions considering facts more analogous to the dispute between Max and Signal. For example, in *U.S. Fire Insurance Co. v. Bunge North America, Inc.*, 244 F.R.D. 638, 645 (D.Kan.

---

4. There is nothing before the Court to suggest that any document related to what Arch Re's counsel describes as its "highly proprietary rating tool" is at issue in the current dispute (*see* Tr.

6:4–5), but if the Court is mistaken then Arch Re should be given an opportunity to be heard on that issue.

2007), the court observed that document requests seeking reserve information should be evaluated on a case-by-case basis and found that "the actual amounts of the Insurers' loss reserves—including any changes to those amounts—could, at the least, lead to admissible evidence relating to the Insurers' own beliefs about coverage and their liability, as well as their good or bad faith in handling and investigating [the insured's] claims." Likewise, in *Bernstein v. The Travelers Ins. Co.*, 447 F.Supp.2d 1100, 1107 (N.D.Cal.2006), the court acknowledged that the amounts at which an insurer sets reserves show "what [the insurer] actually knew and thought, and what motives animated its conduct" and thus are "critical areas of inquiry in bad faith cases" and are "fully fair game for discovery." *Accord Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 328–29 (N.D.W.Va. 2006).

In addition to supporting Signal's claims that Max "[f]ail[ed] to at[tempt] in good faith to effectuate a prompt, fair and equitable settlement of Signal's claims" (Amended Answer to Crossclaim for Interpleader of Signal International, L.L.C., with Crossclaims against Max Specialty Insurance Company dated Dec. 23, 2010 ¶ 30(A) (Dkt. No. 79)), information concerning the reserve information may also reflect Max or Arch Re's "own beliefs about coverage and their liability" and thus provide some insight into what Max and Arch Re did or did not know about the risks of insuring the dry dock, which is relevant to Max's allegations that Signal engaged in fraud.

Accordingly, to the extent Max relies on its designation of certain material in the Arch Re file related to "reserves" as a basis for withholding any documents, it is directed to produce those documents unless some other viable ground for withholding exists. As Max has not cited any, Max is directed to produce documents Bates-stamped ARCH 59, 98, 99, 100, and 166–69 in their entirety.

3. *Applicability of the Common Interest Privilege to Communications between Max and Arch Re*

■ "A 'common interest' doctrine, erroneously called 'common interest privilege' or 'joint defense privilege,' is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege," *Sokol v. Wyeth, Inc.*, No. 07 Civ. 8442(SHS)(KNF), 2008 WL 3166662, *5 (S.D.N.Y. Aug. 4, 2008) (citation omitted). "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989). It exists "to protect the free flow of information from client to attorney ... whenever multiple clients share a common interest about a legal matter." *Id.* at 243–44. The doctrine "is not an independent source of privilege or confidentiality" so that "[i]f a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." *Sokol*, 2008 WL 3166662, at *5 (citations omitted); *see also HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 71 (S.D.N.Y.2009) ("*HSH Nordbank*").

■ Obtaining the protections of the common interest doctrine requires a two-part showing. First, the parties exchanging otherwise privileged information must establish "a common legal, rather than commercial, interest." *Sokol*, 2008 WL 3166662, at *5. "The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." *North River Ins. Co. v. Columbia Cas. Co.*, No. 90 Civ. 2518(MJL)(JCF), 1995 WL 5792 at *3 (S.D.N.Y. Jan. 5, 1995) (citation omitted) ("*North River*"). For courts to find such a common legal interest, the parties must have come to an agreement, "though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy." *Lugosch v. Congel*, 219 F.R.D. 220, 237 (N.D.N.Y.2003); *see, e.g., Schwimmer*, 892 F.2d at 243 (examining whether "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel."); *HSH Nordbank*, 259 F.R.D. at 72. Courts may look to whether "multiple persons are represented by the same attorney" or any other evidence

to demonstrate the existence of "coordinated . . . legal efforts." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 446, 448 (S.D.N.Y.1995) (quotation omitted).

Second, the parties must establish that any exchange of privileged information was "made in the course of formulating a common legal strategy[,]" and that the parties understood that the communication would be in furtherance of the shared legal interest. *Sokol*, 2008 WL 3166662, at *5, 7 ("[T]he vital element in establishing that the attorney-client privilege applies is that the communication is made in confidence for the purposes of obtaining legal advice from the attorney."). One fact courts often consider in assessing this factor is whether an attorney for either party participated in the exchange of privileged information. *See, e.g., HSH Nordbank*, 259 F.R.D. at 72 ("[C]ounsel for one of the parties was actively engaged in the communications at issue. Thus, this is not a situation where the various non party lenders and Nordbank discussed subject matter previously discussed with counsel and now seek to assert privilege for that reason alone."); *cf. Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y.1996) ("Salomon wants to protect confidences it shared with its own attorneys and then shared, not with Northrop's attorneys, but with Northrop. To extend the common interest doctrine that far would mean that a party could shield from disclosure any discussions it had with another person about a matter of common interest simply by discussing that matter first with its attorneys.") (citations omitted).

Here, Max argues that its relationship with Arch Re gives rise to a common legal interest because "resolution of Signal's coverage claims and Max's rescission claim directly impacts what funds may be returned to Arch Re or which Arch Re may be additionally obligated to pay." (Max Opp. Mem. at 14). Max then cites to several cases in which courts have found a common interest between ceding insurers and their reinsurers, arguing that those cases demonstrate that "[r]einsurers 'follow the fortunes,' meaning that they bear the same risk the insurer bears under its policy with the insured." (Max Opp. Mem. at 13).

■ Max's position requires the Court to accept a categorical rule that ceding insurers and their reinsurers share a joint legal interest because a reinsurer's obligations of payment are necessarily tied to the ceding insurer's payment obligations. However, courts have declined to adopt such a rule, finding that "the determination of whether the common interest doctrine applies [as between a ceding insurer and reinsurer] cannot be made categorically." *North River*, 1995 WL 5792, at *4. Unlike the relationship between a direct insurer and its insured, in which the "direct insurer may have a duty to defend its insured, thus implying some level of cooperation in litigation[,]" in the reinsurance context, "the interests of the ceding insurer and the reinsurer may be antagonistic in some respects and compatible in others. Thus, a common interest cannot be assumed merely on the basis of the status of the parties." *Id.* (internal citation omitted). For example, in *Reliance Ins. Co. v. American Lintex Corp.*, No. 00 Civ. 5568(WHP)(KNF), 2001 WL 604080, at *4 (S.D.N.Y. June 1, 2001), in which "[p]laintiff's only argument for finding a common interest between the parties . . . [wa]s that they [we]re insurer and reinsurer[,]" the court concluded that "[t]he existence of this relationship alone is not a sufficient basis upon which to find that the attorney-client privilege shields from disclosure the material identified." The court acknowledged that their "commercial interests coincide[d], to some extent," but found that "no evidence ha[d] been proffered that establishe[d] that [the plaintiff] and its reinsurer share the same counsel or coordinate legal strategy in any way." *Id.*

Max disputes the applicability of *North River* and any cases that rely on that decision, including *Reliance* (Max Opp. Mem. at 15), because the ceding insurer and its reinsurers in *North River* ultimately developed an antagonistic relationship. However, this argument overlooks the fact-intensive scrutiny that the court in *North River* applied— the court concluded that there was no common legal enterprise because the ceding in-

surer did not present evidence of an agreement establishing a joint prosecution, a coordinated legal strategy, shared legal expenses, or that one party exercised control over the conduct of the action. 1995 WL 5792, at *5. This detailed analysis demonstrates that the reinsurance relationship alone does not establish the *per se* existence of a shared legal interest. Rather, the court must assess whether the evidence suggests that the ceding insurer and its reinsurer have forged a "cooperative and common enterprise towards an identical legal strategy." *Lugosch*, 219 F.R.D. at 237.

██ Other than arguing that Arch Re "follows the fortunes" (or, in this case, liabilities) as its reinsurer, Max has not asserted any additional arguments or provided any evidence that proves a "cooperative and common" legal enterprise with Arch Re, as is its burden. To the contrary, the record suggests that Max and Arch Re do not share an identical legal interest. First, it was Max, not Arch Re, that objected to Arch Re's compliance with Signal's subpoena. Moreover, while it is notable that Arch Re turned its file over to Max, Arch Re appears to have done so simply to enable Max to handle what Arch Re's counsel referred to at the September 15 conference as "a dispute between themselves about privilege" (Tr. 4:12–13), apparently in reference to Max and Signal. Furthermore, while counsel for Arch Re did not address the application of the common interest doctrine at the conference, she noted Arch Re's objection to expending resources, as a non-party, to create a privilege log that would be largely duplicative of Max's log given that most of its file on the dry dock consisted of documents supplied by Max. (Tr. 4:14–20). Taken together, these facts do not support a finding that Max and Arch Re shared a common legal interest.

██ Furthermore, Max has not proven, or even argued, that it disclosed otherwise privileged material to Arch Re "in the course of formulating a common legal strategy" or "for the purposes of obtaining legal advice from" Arch Re, the second inquiry in assessing a claim of common interest protection.

See *Sokol*, 2008 WL 3166662, *5, 7. For example, Max's amended privilege log does not indicate whether any attorneys were involved in the exchange of documents between Arch Re and Max, which might have supported such a finding. See *HSH Nordbank*, 259 F.R.D. at 72. Nor has Max presented arguments or evidence about the legal necessity of exchanging otherwise protected information. Therefore, on the record presented, the Court is not persuaded that Max and Arch Re share a common legal interest that would entitle Max to withhold documents that it produced to Arch Re.

To the extent that Max has shared otherwise privileged information with Arch Re, any privilege applying to such documents has been waived because Max has failed to establish that it shares a common legal interest with Arch Re. See *McLean v. Continental Cas. Co.*, No. 95 Civ. 10415(HB)(HBP), 1996 WL 684209, at *1 (S.D.N.Y. Nov. 25, 1996).[5] Therefore, Max is directed to produce to Signal the documents it has disclosed to Arch Re.

### C. Max's Claims File and Documents from Max's Former Counsel

As noted, *supra*, the Court is issuing a separate order that requires the parties to appear at a hearing to resolve the dispute regarding the two other categories of documents that Signal seeks—Max's claims files and documents from Max's former counsel—as the present record is not adequate to resolve them.

## II. *Max's Motion to Compel*

### A. Max's Requested Discovery

Max seeks the production of documents related to a dry dock operated by Signal in Pascagoula, Mississippi (the "dual carrier"). In particular, Max seeks the production of the following documents:

- A list of all oil rigs and other vessels drydocked between January 1, 2007 and the present date by the dual carrier;

---

5. As the Court finds that no common legal interest exists between Max and Arch Re, it is unnecessary to determine whether the documents it disclosed to Arch Re are otherwise privileged.

- All contracts between January 1, 2007 and the present date for the drydocking of all oil rigs and other vessels drydocked by the dual carrier; and

- All analyses showing (a) the revenue received under each of the contracts, (b) the costs to Signal of each contract, and (c) Signal's profit in each contract.

(Memorandum of Law in Support of Defendant Max Specialty Insurance Company's Motion to Compel Production of Documents from Defendant Signal International, LLC ("Max Mem.") at 4–5 (Dkt. No. 143) (citing Max's Amended Fourth Request for Production of Documents to Signal dated May 12, 2011 ("RFP"), Nos. 7–9)).

Max also seeks the production of records related to any pumping of the dual carrier, in particular, "[a]ll logs and other records reflecting any and all pumping of the DUAL CARRIER'S ballast tanks, machinery spaces and other spaces between January 1, 2010 and the present date." (Max. Mem. at 7 (citing RFP No. 20)). In its Revised Amended Fourth Request for the Production of Documents, Max modified its request in RFP No. 20 to include all documents from January 1, 2007 to the present. (*Id.* at 7 n. 2).

### B. Dual Carrier Business Documents

Max contends that the dual carrier documents are relevant to its defense against Signal's business interruption claim as well as its so-called "bad faith" claim that seeks extra contractual damages. (Max Mem. at 5). Max alleges that Signal represented in its insurance application that its business interruption risk could be mitigated by the dual carrier because of redundancies in dry dock operations between the dry dock in Texas and the dual carrier in Mississippi, which were outlined in a property risk assessment report Max obtained with Signal's insurance application (the "risk report"). (*Id.* at 5–6 & Declaration of Stephen D. Straus dated Apr. 12, 2012 ("April 12 Straus Decl."), Ex. F (Dkt. No. 141–6)). Max suggests that the dual carrier in Mississippi could have taken on some of the work that the dry dock in Texas could not during what was an unusually busy, and therefore, poten-

tially lucrative period in 2010 after the dry dock sank. (*Id.* at 6–7).

In opposition, Signal argues that the business records related to the dual carrier are irrelevant and not reasonably calculated to lead to admissible evidence related to any claims in the action, including its business interruption claim. Signal's primary argument is that neither it nor its underwriter ever represented to Max that there was a redundancy between the dry dock in Texas and the dual carrier in Mississippi, which it notes is owned by a different Signal entity than the owner of the Texas dry dock. (Signal International, L.L.C.'s Memorandum in Opposition to Max Specialty Insurance Company's Motion to Compel Production of Documents dated Apr. 26, 2012 ("Signal Mem. Opp."), at 2, 4–5 (Dkt. No. 146)). Signal contends that the risk report Max submitted with its motion was prepared to assess the total value of all of Signal's property to be insured, including the dual carrier, not to support an application for excess insurance on the dry dock, as Max suggests. (*Id.* at 4). Signal also provides testimony from the underwriter of Max's excess insurance policy as evidence that Max did not consider the redundancies between the dry dock and the dual carrier in issuing its policy. (*Id.* at 4 & Ex. A (deposition testimony of Trip Morano)). Finally, Signal notes that the forensic accountants Max retained to adjust Signal's business interruption claim did not request the dual carrier business records, indicating their lack of relevance to Max's claims. (*Id.* at 3–4).

■ Signal is correct that the risk report is broader than describing just the dry dock, in that it describes six properties, including the dry dock and dual carrier, and that the risk report was "prepared to assist underwriters in evaluating the exposures, operations, and loss prevention for the Signal International gulf coast properties." (April 12 Straus Decl., Ex. F at 5). However, Signal overlooks the portions of the risk report that state; "[b]usiness interruption can be mitigated due to redundancy in operations between the Texas and Mississippi operations." (*Id.* at 6). The Max underwriter did not testify at his deposition one way or the other

whether he relied on the risk report generally or the representations it made concerning redundancies specifically. In any event, what Signal may have represented to Max goes more to Max's rescission claim than to Signal's business interruption claim. More important to Signal's business interruption claim is whether the dual carrier could have absorbed any of the work that the dry dock was unable to take on after its sinking. By reference to the information in the risk report and its suggestion that the dual carrier may have provided some redundant services to the dry dock, Max has met its burden to establish that the dual carrier business documents are reasonably calculated to lead to the discovery of admissible evidence. Therefore, Max's motion to compel is granted as to the dual carrier's business records and Signal is directed to produce documents in accordance with Max's RFP Nos. 7–9.

### C. Dual Carrier Pumping Records

Max contends that the pumping records of the dual carrier are "relevant to the known condition of the AFDB–5 [dry dock] before it sank, and thus to Max's misrepresentation defense against all of Signal's claims." (Max Mem. at 7). According to Max, these records may dispute Signal's contention that the regular pumping of the dry dock was not normal, as Signal alleges, and would therefore challenge Signal's contentions about the dry dock's seaworthiness. (*Id.* at 8). Anticipating Signal's argument that the differences between the dry dock and the dual carrier would negate the utility of the comparison between their pumping records, Max argues that such an argument goes to admissibility rather than discoverability. (*Id.*).

Signal does in fact argue that the dry dock and the dual carrier are so drastically different that the dual carrier's pumping records would shed no light on the seaworthiness of the dry dock based on its pumping history. (Signal Opp. Mem. at 5–6). In support of its claim, Signal provides an overview of the many differences between the two facilities, including the fact that the dual carrier "was insured for a lesser amount, has smaller dimensions, has a much lower lifting capacity[,] is completely different in a design, being made up of two dumb barges welded together rather than being comprised [of] eight pontoons" and is 30 years younger than the dry dock. (*Id.* at 6 & Ex. B (report assessing value of certain Signal equipment)). Additionally, Signal argues that the burden of collecting the pumping records for the dual carrier, which are maintained only in physical format, would be overly burdensome for the recovery of "at best tangentially relevant information." (*Id.*).

The Court concludes that Max has not established the dual carrier's pumping records are relevant because there is no evidence that the two facilities are maintained in a similar fashion. The Court notes that the report Signal appended to its opposition memorandum as Exhibit B describes the dual carrier as "somewhat of a unique vessel and the quantity of comparables [i]s questionable." (*Id.*, Ex. B at 18). This description, and the fact that the dry dock and dual carrier appear to be quite different structures—one of which consists of two dumb barges and the other eight pontoons—leads the Court to conclude that the dual carrier's pumping records will not provide the value to Max's assessment of the dry dock's seaworthiness that it suggests. In sum, the Court is not persuaded that the records described in RFP 20 are relevant and Max's motion to compel the production of these records is accordingly denied.

### III. *Conclusion*

For the reasons provided, Signal's motion to compel is granted as to its request for the Arch Re file and any other reinsurance documents or communications related to the excess insurance policy Max issued to Signal. Max's motion to compel is granted as to its request for dual carrier business records and is denied as to its request for dual carrier pumping records. The Clerk of the Court is directed to close docket entry 140.

**SO ORDERED.**